[CHANCERY.   LOCAL LAW.]

## DUNLAP and Another, Appellants. *against* DUNLAP and Others, Respondents.

A question of fact, in a suit in equity, respecting the proprietary interest in an entry of lands within the Military District of Ohio.

Rule of equity, that where land is sold as for a certain quantity; a Court of Equity relieves if the quantity be defective, only applicable to contracts for the sale of land in a settled country, where the titles are complete, the boundaries determined, and the real quantity known, or capable of being ascertained by the vendor.

*Feb. 9th.*

THIS cause was argued by Mr *Scott* for the appellants, and by Mr *Doddridge* for the respondents.

*Feb. 17th.*

Mr. Chief Justice MARSHALL delivered the opinion of the Court.

This suit was brought originally by John Dunlap, the appellee, in the Circuit Court of the United States, sitting in the District of Ohio, to obtain a conveyance of one moiety of a tract of land in the State of Ohio, which was purchased, as is alleged in the bill, on the joint account of the plaintiff and of his uncle Alexander, one of the defendants in the Circuit Court. Alexander, who made the contract, obtained the conveyance to himself, and afterwards conveyed the land to his son James. Both Alexander and James were made defendants.

Some time about the year 1792 or 1793, Alexander Dunlap purchased from John Fowler an entry of one thousand acres of land on the Scioto river in the Virginia Military District, at the price of 100 pounds, Virginia currency An agreement was entered into at the time between the plaintiff and the defendant, Alexander, that this purchase should be made in partnership, the plaintiff says, with himself, the defendant says, with John Dunlap, senior, his father. The testimony, however, proves incontestibly that, though the moiety of the purchase money was paid by the father, it was paid for the plaintiff, whom he always considered as the rightful proprietor of the land. The purchase will, therefore, be treated as being made on the joint account of the plaintiff and Alexander Dunlap. James Dunlap claims as a volunteer under Alexander, and his title is dependant on that of his father.

The original entry was made the 7th of August, 1787. It was withdrawn and re-entered on the 22d of April, 1796, and this entry was again withdrawn and re-entered on the 25th of July, 1796. The warrant was re-entered on nearly the same land. The changes were such as might probably be caused by a more perfect knowledge of the country; and the last entry, as surveyed on the 20th of October, 1796, contains about three hundred acres of surplus land. The plat of the surveyor, however, on which the patent issued, specifies only 1000 acres. The right to this surplus constitutes the chief subject of controversy between the parties The plaintiffs contend that the whole entry was purchased and that in such contracts the whole entry passes to the purchaser. The defendants insist that the original contract was

for only 1000 acres, and that the surplus land belonged to Fowler. That he afterwards purchased this surplus, not on joint account, but for himself. In 1802 he obtained a grant for the whole tract in his own name, and now claims the whole surplus as his separate property.

The entry is for 1000 acres of land. The survey made on the entry purports to be for 1000 acres of land. The plat and certificate of survey were transferred by John Fowler to Alexander Dunlap, by an endorsement in the following words: " I do hereby assign all my right, title, and interest to the within land to Alexander Dunlap, and request a grant may issue accordingly."

This is the only written evidence of the contract, and purports to be a transfer of the whole entry and survey.

The defendant, Alexander, alleges, in his answer, that the original contract was " only for 1000 acres of land," that after the survey he discovered the surplus and mentioned it to Fowler, who said that he had contracted to sell but 1000 acres, and should require additional compensation for the excess. The respondent agreed to give him 300 dollars for the surplus, and Fowler's receipt for that sum, dated the 17th of October, 1800, is annexed to the answer. Though the defendant introduces into his answer the allegation that he purchased only 1000 acres of land, yet it is remarkable, that in the first part of the same answer he states himself to have purchased the entry. and also says that the surplus was not discovered until many years afterwards, when the survey was made. The reservation of a surplus, when no surplus existed. in a contract which purported to be made for the entire tract, at a time when the purchase of entries was a common transaction, and the probability that an entry might be so surveyed as to comprehend more land than it called for, or so as to interfere with other entries and lose a part of the land it covered, was a matter of general notoriety, is so extraordinary a circumstance as to justify a critical examination of the testimony by which it is supported.

Alexander Dunlap, in the first instance, states the contract to have been, in fact, what it purports to be, a purchase of the entry, that is, of the entire entry. To reconcile this

with the subsequent declaration, that "the purchase was only of 1000 acres of land," we must suppose that, as the entry called for that quantity, and he purchased the entry, he might allow himself to say that he purchased only 1000 acres. ' He drew an inference, however, which the law does not draw, and on which he ought not to have acted until he consulted his partner.

The defendants also sustain their pretensions by the testimony of John Fowler, whose deposition was first taken on the 24th of October, 1817. He identifies the receipt, and swears that it was a fair transaction.

His deposition is taken a second time on the 3d of August, 1819. He swears "that he sold to Alexander Dunlap 1000 acres of land within the bounds of a military survey, made in his name, as assignee of Arthur Lind, on the Scioto river, and, afterwards, about the 7th day of October, 1800, he sold to said Alexander Dunlap, for the consideration of 300 dollars, all the surplus contained within the bounds of the said military survey."

This deposition states the original contract as if a survey, not an entry, had been the subject of it ; and as if the transfer had been of a specified portion of that survey, not of the whole.

On the 18th of November, 1820, a copy of the plat and certificate of survey was obtained from the general land office, by which it appeared that the survey was made on the 20th of October, 1796, three or four years after the entry had been sold.

The deposition of John Fowler was again taken on the 28th of November, 1822. He swears that in 1792, or 1793, he sold to Alexander Dunlap 1000 acres, part of a military survey made in the deponent's name, as assignee of Arthur Lind, on the Scioto river, at the rate of 10 pound Virginia currency per 100 acres, reserving the surplus should the said survey contain any within the bounds." Some years afterwards, he was informed by the late General Nathaniel Massie, that " the survey contained about 300 acres of surplus." Sometime after which, he proposed to sell the said surplus to Alexander Dunlap, who agreed to give him therefor 300 dollars.

In this deposition the witness states a sale by the acre, although, in his preceding depositions, he had spoken of a sale in gross. In his second deposition he had mentioned the sale of 1000 acres of land, "within the bounds of a military survey made in his name on the Scioto;" plainly alluding to a survey already made. In his third deposition, he still speaks of a military survey, but plainly speaks of it as of one to be made in future. He reserved the surplus, he said, "should the said survey contain any within the bounds." It is also observable, that he says he received the information from Massie; whereas, Alexander Dunlap says, in his answer, that he himself gave the information to Fowler. This, however, taken in itself, would not be a very material contradiction. It might be accounted for. But the various shapes in which Fowler places the contract certainly show that his recollection of it was very imperfect, and is not entitled to much credit.

The assignment which he made to Alexander Dunlap is of the entire survey. It must be considered as an execution of the contract he had previously made; and is written evidence of the extent of that contract. If, instead of selling the whole survey, as the assignment imports, he had sold only a part of it, his natural course would have been, either to take out the patent in his own name, and give his obligation to convey a part when the patent should issue, or to take it out in their joint names, entering into an agreement specifying their respective interests, or to take some obligation from Alexander Dunlap, binding him to re-convey the surplus. A written contract cannot be varied by such suspicious testimony as that of Fowler; especially in a case which contains within itself the strongest circumstances of probability against the attempt.

This probability is supported by other testimony than is furnished by the contract itself. James Dunlap, the brother of John, deposes, that Alexander Dunlap told him he and the plaintiff had purchased the *tract of land* in partnership; language which certainly alludes to the whole tract. The partition, too, which was afterwards made, after an actual survey for the purpose, if it divided the tract into moie-

ties, is almost conclusive evidence that the idea of Fowler's title to the surplus had not then occurred to the appellant.

The counsel for the appellant endeavours to support Fowler's title to the surplus, independent of the special contract, and cites some cases to show that where land has been sold for a certain quantity, and has, in fact, amounted to much less than the quantity mentioned, a Court of equity has interposed and given relief. But the difference is very material between contracts made for land in a settled country, where the titles are complete, the boundaries ascertained, and the real quantity either known, or within the reach of the vendor, and those made for land situated as was the whole military district at the date of this contract. It was notoriously the general practice to sell an entry or a survey taking the chance of surplus, and the hazard of losing a part of the land by other entries. A special contract, departing from this general custom, ought to be in writing, or to be very clearly proved, especially when the written evidence of the contract conforms to this general custom.

It is, also, worthy of remark, that the entry, as it stood when sold, could not have contained any surplus land. It calls " to begin on the Scioto, at the lower corner of Benjamin Lawson's entry, No. 439, running down the river 1,000 poles when reduced to a straight line, thence from the beginning with Lawson's line so far that a line parallel to the general course of the river shall include the quantity." No excess ought to be anticipated from the survey of such an entry, and the anticipation of such excess is against all probability. The subsequent changes of the location must be supposed to have been made by the owner of the land, and the survey also must have been made by his direction, perhaps through his agent, the locater, or according to the judgment of the surveyor. Nothing could accrue to Fowler from a survey so made.

We are, then, entirely satisfied, that the whole tract was purchased, and ought to be divided between the purchasers in equal moieties, unless some partition has been made or agreed upon between them.

It is certain, that an effort towards a partition has been

made, and the questions which grow out of this effort constitute the sole difficulty in the case.

The bill charges, that before the grant was issued, the parties divided the land in equal quantities, and the plaintiff paid Alexander 60 dollars for choice of moieties, and elected to take the northern, or upper part. A dividing line was then run, and each party took possession of his land in severalty.

The defendant admits, that there was a conversation concerning a division. that the line was partially run, and that the plaintiff paid him 60 dollars for choice ; but insists, that the line was only partially run, that the division was incomplete, and that the intention was to divide 1,000 acres only.

It is, then, admitted, that some division was made, that some line was run, that John paid Alexander 60 dollars for choice, and chose the northern part. If that line can be found it ought to be established, and if it has been run only a part of the way, it ought to be continued to the outward boundary of the tract. If it cannot be found, the land is now to be divided into moieties in the manner then agreed on.

James and John Stephenson depose, that they were the chain carriers when the survey for the purpose of a division was made. That a dividing line was run from the back line towards the river. They both think, that a marked line to which they were conducted in the presence of the parties, and of James Hough, the surveyor, was the line which was then run. Their opinion is founded on the continguity of the corner which was shown to them as the beginning, to a branch which is near it, and which they think they recollect. The line was run about twenty years before they gave their depositions, which was in 1818, and they do not know whether the line now shown them is the true line or not.

Other testimony shows, that it cannot be the true line The surveyor proves, that the marked tree shown as the beginning, had not, in 1821, been marked more than seven or eight years : and all the testimony in the cause proves, that

the line ran through James Dunlap's orchard, and that he himself frequently said so. The line now claimed by him. and supposed by the Stephensons to be the true line, would not come near his orchard. It is apparent, then, that this line has been made long since the division, and there is some reason to suppose it was made by James Dunlap, who occupied Alexander's moiety of the tract.

The place established by the Court as the beginning, is a white oak and blue oak, standing in the western line of the tract, and marked as a corner. Being in the line, there could be no reason for marking them as a corner unless such had been the fact, and the trees could be a corner only between the Dunlaps. The surveyor cut a block out of the ash, including one of the chops, and found, from marks which are considered as unerring, that the chop had been made twenty-one years; that is, there were twenty-one year's growth over it. This was in December, 1718. The chop might have been made in the autumn of 1797, or the spring of 1798. The dividing line is supposed to have been run in 1798. A line from this point to the river, so as to divide the tract equally, passes through James Dunlap's orchard, and leaves rather more of it on the side of John than would be left by the line which James Dunlap had admitted. This line is established by the decree of the Court. The testimony is, we think, in its favour, and that there is no error in the decree. It is affirmed, with costs.