Marcus A. **ARNHEITER**, Plaintiff,

v.

Paul R. **IGNATIUS** et al., Defendants.

No. 48414.

United States District Court
N. D. California.

Oct. 22, 1968.

Marvin E. Lewis and Steven A. Sindell of Lewis, Rouda & Winchell, San Francisco, Cal., for plaintiff.

Cecil F. Poole, U. S. Atty. and Jerry K. Cimmet, Asst. U. S. Atty., San Francisco, Cal., for defendant Ignatius.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This action is brought by Marcus A. Arnheiter, Lieutenant Commander, United States Navy, against the Secretary of the Navy for a Declaratory Judgment and for Relief in the Nature of Mandamus.

The case is now before the court on defendant's motion to dismiss the action for lack of jurisdiction over either the person or the subject matter and for failure of the complaint to state a claim upon which relief can be granted or, in the alternative, for a judgment in favor of defendant on the ground that there is no genuine issue as to any material fact and that defendant is entitled to judgment as a matter of law.

The record consists of the complaint and certain additional matter presented by the parties. Presented by the de-

fendant and moving party are affidavits of Rear Admiral Donald C. Irvine and Vice Admiral Benedict J. Semmes and defendant's Exhibits C through F containing extensive documentary matter. Presented by the plaintiff are affidavits of plaintiff Arnheiter with attached plaintiff's Exhibits A through I, also containing extensive documentary matter.

The basic facts shown by the record are as follows:

On December 22, 1965, Lieutenant Commander Arnheiter was assigned to the command of the U.S.S. Vance, a Destroyer Escort under assignment for duty in the Vietnam war theatre as part of a Cruiser-Destroyer Task Group under the immediate command of Rear Admiral Donald C. Irvine. This Task Group was in turn a subordinate command under Vice Admiral Baumberger, Commander, Cruiser-Destroyer Forces, Pacific Fleet, which in turn was a subordinate command under Admiral Roy Johnson, Commander in Chief, Pacific Fleet.

Between mid-March and March 29, 1966, Commander D. E. Milligan, Commander, Escort Squadron Seven, received messages from commanders of other squadrons concerning irregular practices aboard the Vance and also concerning certain improper operations of the Vance that interfered with other ships; also a call from a Chaplain, Lieutenant Dando, concerning his observations, made aboard the Vance, of irregular practices and low morale; also a confirmatory report from a member of Milligan's own staff. After counseling with some of his fellow officers, Commander Milligan reported his information to Admiral Irvine. (Letter of Commander Milligan, July 15, 1966, part of Def.'s Ex. E).

On March 29, 1966, Rear Admiral Donald C. Irvine, as Commander of the Cruiser-Destroyer Task Group, upon receipt of this information, leading him to believe that Arnheiter should be relieved of his command "because of irregular practices in which he had engaged and irregular policies which he had established" and acting under the provisions of Article C–7801(4) (d) 2, Bureau of Naval Personnel Manual and after conferring with Rear Admiral T. S. King (who was about to relieve Irvine) sent a naval message to Vice Admiral Benedict J. Semmes, Chief of Naval Personnel, requesting that Arnheiter be relieved of his command of the Vance so that these matters might be investigated, indicating that speed was mandatory due to impending extended redeployment of the Vance on combat operations. (Affidavit of Admiral Irvine).

On March 30, 1966 Vice Admiral Semmes, upon receipt of this request and after telephonic concurrence in the request from Vice Admiral Baumberger, Commander, Cruiser-Destroyer Forces, U. S. Pacific Fleet, issued Naval Personnel Order 174035 directing that Arnheiter be detached as commanding officer of the Vance and that he report aboard U.S.D. Dixie for temporary duty and further assignment by Chief of Naval Personnel. (Affidavit of Admiral Semmes).

On March 31, 1966, Commander D. E. Milligan, acting under this order, boarded the Vance, relieved Arnheiter of the command and made a preliminary investigation of the circumstances leading up to the detachment, obtaining approximately 35 statements from officers and crewmen of the Vance which, according to Milligan, corroborated information already received by him from others. (Milligan's letter of 7/15/66, part of Def's Ex. E).

Thereupon, Rear Admiral T. S. King, who had just replaced Rear Admiral Irvine as Commander of the Task Group, acting under Naval Regulations, 32 CFR 719.254, et seq, and Article C–7801(4) of the Naval Personnel Manual, appointed Captain Ward A. Witter to conduct an "informal one-officer investigation" (provided for by Navy Regulations 32 CFR 719.611) of the circumstances leading to the removal of Arnheiter.

On April 2, 1966, Captain Witter conferred with Arnheiter concerning his

rights and advised him to obtain counsel. Arnheiter obtained assignment from the Base Legal Office of Lieutenant McGovern as his counsel. On April 5th Witter reviewed with Arnheiter and his counsel the statements obtained by Milligan, the preliminary investigating officer, copies of which had been given by Witter to Arnheiter on the previous day. With Arnheiter and his counsel present, Witter then conducted hearings on April 6, 7, 8, 9, 11, 12 and 13, taking testimony under oath from 20 witnesses, receiving a sworn statement from Arnheiter and receiving other sworn statements of witnesses and other documents. (Witter Report, Pltf.'s Ex. I).

Under date of April 27, 1966, Witter prepared and forwarded to Rear-Admiral King, who had convened the investigation, a 13 page report of the investigation (Pltf's Ex. I) containing a detailed description of the proceedings and his findings of fact as required by Navy Regulations, 32 CFR 719.613.

Without attempting to detail Witter's 40 separate findings, they involve in substance and effect improper handling of ship's supplies and funds (e. g., 3, 4, 8, 10, 11, 14, 16, 26, 31, 35, 37); questionable policies and poor judgment in matters affecting officer and crew morale (e. g., 3, 6, 25, 27, 29); careless or unnecessarily hazardous operations (e. g., 1, 9, 15, 17, 21, 22, 23, 24, 28, 32, 33, 34, 36, 39, 40); improper operations reports (e. g., 12, 13).

The conclusions reached by Witter from these findings were to the general effect that Arnheiter was not the type to have command; that he lacked the ability to act without guidance and assistance of superiors; that, despite high goals and drive, he is a poor leader, unrealistic and insensitive to what is going on around him; that, although basically honest, he rationalizes distortion of facts to his own advantage; that, although attempting to run his ship in strict and pure chain of command with his officers, his obsession with this purpose affects his ability to make correct and balanced judgments; that most of his actions were relatively minor and in no case malicious; that removal from command would be adequately severe penalty for his performance and, if it stands, will be more than adequate punishment for his actual irregularities.

Witter thereupon recommended that Arnheiter's removal be sustained, that he be not assigned command in the future, either ashore or afloat, but that no disciplinary action be taken against him.

Under date of May 26, 1966, Rear Admiral King, acting on the Witter report, forwarded it to Vice Admiral Baumberger with his own report (Part of Def.'s Ex. E) containing his comments on the Witter findings and his concurrence in the Witter recommendations except in the one respect that King recommended that, since the record showed that Arnheiter had knowingly, wilfully and admittedly violated regulations, he should be disciplined by the issuance of a punitive letter of reprimand.

Upon receipt of the Witter and King reports, Vice Admiral Baumberger on June 7, 1966, provided Arnheiter with copies of the reports, granted requests of Arnheiter that counsel be made available to assist him and, further, granted requests of Arnheiter and his counsel for opportunity to submit further information and to file comments in rebuttal of the findings and opinions. In addition, on July 15, 1966, Baumberger obtained from Commander Milligan, the preliminary investigation officer, a letter of that date (Part of Def.'s Ex. E) setting forth the sequence of events leading up to the relief of Arnheiter and also enclosing the earlier report to Milligan by Chaplain Dando (Part of Def.'s Ex. E) dated March 26th.

Under date of August 30, 1966, Vice Admiral Baumberger prepared for forwarding to Vice Admiral Semmes, Chief of Naval Personnel, and to Admiral Roy Johnson, Commander in Chief, Pacific Fleet, his own report (Part of Def.'s Ex. E) containing his comments on the Witter and King reports and enclosing

an Arnheiter rebuttal statement dated August 5, 1966.

This Baumberger report of August 30th reviews the entire situation and comes to the conclusion that: "Isolated, none of the 'alleged irregularities' is sufficient grounds to sustain relief for cause; that there emerges when reviewing the record, together with many conversations held with Lieutenant Commander Arnheiter, and others intimately acquainted with him, the impression of a brilliant, yet complex officer * * * an officer whose actions in a number of instances, both operational and administrative (including the handling of personnel) did cast some doubt in the minds of his superiors that his judgment, discretion and objectivity could be relied upon in an independent command status."

Baumberger expressed his opinion that "had not the Vance been employed in a forward area, a demand for corrective measures by his superiors would have been more appropriate than his relief from command", adding, however, that "the foregoing should not be misconstrued to indicate that the type commander" (i. e., Baumberger) "condones the irregularities admitted by Lieutenant Arnheiter, no matter how they are explained away."

Thereupon, Baumberger recommended that no disciplinary action be taken against Arnheiter, that his relief from command be sustained only as "for investigation in the light of the circumstances then existing", that he not be restored to the Vance but that he be reassigned to command a destroyer escort of the same force to provide an opportunity for reassessment of his abilities.

Under date of September 9, 1966, Vice Admiral Semmes, Chief, Naval Personnel, acting upon the foregoing and also upon a brief from his Assistant for Performance, W. R. De Loach (part of Def.'s Ex. E.) approved the removal of Arnheiter "for cause" (part of Def.'s Ex. E). On the same date Semmes forwarded to President, Line Selection Board for Commanders (which passes upon promotions for lieutenant commanders) the memo (part of Def.'s Ex. F) of this action (to be placed in Arnheiter's Selection Board jacket), together with a copy of Arnheiter's letter, advising that the reassignment of Arnheiter would be held in abeyance pending report from Commander in Chief, Pacific Fleet.

Meanwhile, Admiral Roy A. Johnson, Commander in Chief, Pacific Fleet had requested Vice Admiral Baumberger to submit to him additional data and another more detailed evaluation and analysis of the allegations against Arnheiter.

Under date of November 1, 1966, Vice Admiral Baumberger responding to the request of Commander in Chief, Pacific Fleet, prepared a second report (Pltf.'s Ex. B) in which he sharply criticized Captain Witter, the investigative officer, for having "unwittingly compounded his already difficult task by injecting himself personally into the role of a 'psychologist' rather than in that of an impartial finder of fact" and for having "neglected or refused to pursue available evidence concerning specific allegations of misconduct" and for having based his findings for the most part "on the unsubstantiated opinions of witnesses inimical to Lieutenant Commander Arnheiter".

Admiral Baumberger then proceeded to re-examine the Witter findings one by one in the light of the evidence and to express his opinion as to each, rejecting most of them as either insufficiently supported by the evidence or as being insufficient to show impropriety, minimizing others because of triviality or mitigating circumstances but concluding that some show conduct which could not be condoned. Baumberger then reiterated his recommendations of August 30th, already above set forth.

On January 20, 1967, Admiral Johnson, Commander in Chief, Pacific Fleet, acting on the foregoing rejected Baumberger's recommendation that Arnheiter should be reassigned to another destroy-

er-escort command in the force. (See Pltf.'s Ex. A [chronology]).

On February 16, 1967, following this determination of the Commander in Chief, Pacific Fleet, Vice Admiral Baumberger detached Arnheiter from the staff of the Cruiser-Destroyer Force. On February 23rd, Arnheiter reported to Commander, Western Sea Frontier (Plft.'s Ex. A, chronology 1/23/67 for duty and is now permanently assigned with lieutenant commander rank to non-command shore duty at Treasure Island, San Francisco.

On March 3, 1967, Arnheiter visited Vice Admiral Semmes, Chief Naval Personnel and unsuccessfully requested either the convening of a full scale court of inquiry to review his removal or a general court martial. On April 7, 1967, Arnheiter wrote to Semmes citing claimed violations of Navy Regulations and the Naval Personnel Manual. (See Plft.'s Ex. A–chronology).

Finally, on November 24, 1967, the defendant, Secretary of the Navy, wrote (Def.'s Ex. C) Arnheiter, responding to his six previous letters between May 9, 1967 and October 21, 1967, to the effect that all his communications and his entire personnel file, including his rebuttal submissions, the investigation reports and the action of all reviewing authorities had been extensively and personally studied by the Secretary and by the Judge Advocate General of the Navy; that the Secretary had also considered the opinions of Admiral Settle and Captain Alexander (who had interested themselves on behalf of Arnheiter's contentions) ; that the Secretary had taken personal interest in the issues which Arnheiter raised concerning the character of his past services in command and the appropriateness of his future assignment to command and the Secretary concluded: "Having now completed my evaluation I regret to inform you that your requests for further inquiry into this matter are not granted. I am convinced that you have received a full opportunity to present your position in this case. From the entire record before me, I can identify no valid reason for altering the decision that your further assignment would be inappropriate".

On December 19, 1967, plaintiff commenced this suit contending that his summary detachment from command of the Vance and the subsequent approval thereof were in violation of Navy Regulations and in effect a deprival of procedural due process under the Fifth Amendment and asking this court for a judgment declaring that he is entitled to another Navy hearing—a fair and impartial one—on all matters relating to his detachment from command and his promotion status and ordering the Secretary of the Navy to convene a court of inquiry, or other appropriate hearing, for that purpose.

Before taking up the particular allegations of plaintiff's complaint and affidavit, we should first consider the underlying question of law presented in this case, i. e., whether and, if so, upon what conditions and limitations, do the federal courts have power to review such proceedings and decisions of the armed forces as are presented by the record.

It will be noted from the record thus far set forth that, although plaintiff alleges that his removal from command and his subsequent failure of promotion will adversely affect his chances of future promotion, there is nothing in the record to negate the possibility that the Navy, should it choose to do so in the future, could reassign plaintiff to a command and/or promote him to higher rank.

It will also be noted that plaintiff has never been court martialed or subjected to discharge or any punitive action whatever—no forfeiture of pay or confinement to quarters or demotion in rank—not even a letter of reprimand. He was, before his removal from command, a Lieutenant Commander in the United States Navy and still is such today with the full entitlements of that rank, subject only to Navy Regulations and to orders of his superior officers. Clearly, plaintiff's basic and only grievance is that a duty order made by a superior

officer detaching him from a command assignment was subsequently approved after further investigation and that he has not since been promoted in rank.

## LAW RE REVIEW OF MILITARY DECISIONS

Article II, Section 2 of the Constitution makes the President the Commander in Chief of the Army and Navy and Article I, Section 8 grants to Congress the power to make rules for the government and regulation of the land and naval forces.

Stemming from such old cases as Dynes v. Hoover, 20 How. 65, 61 U.S. 65, 15 L.Ed. 838 (1857), Decatur v. Paulding, 14 Pet. 497, 39 U.S. 497, 10 L.Ed. 559 (1840) and United States v. Eliason, 16 Pet. 291, 41 U.S. 291, 10 L.Ed. 968 (1842), a general rule gradually crystallized in the Supreme Court to the effect that military decisions—judicial (court martial) or administrative—are not subject to judicial review by the federal courts except to the extent that these courts, exercising their power to entertain habeas corpus petitions, may make the single inquiry whether a military decision under collateral attack was within the military jurisdiction. The term jurisdiction was narrowly construed to mean, not whether the military acted erroneously or even whether it conformed to the due process provisions of the Bill of Rights, but only whether the military had jurisdiction of the person and subject matter and acted within its powers. It has been the view of the Supreme Court that for those in the military or naval service the military law, as it may be enacted by the Congress and administered by the President as Commander in Chief, is the measure of the due process to which those in the military or naval service are entitled.

This so-called "non-reviewability rule" has been long applied by the Supreme Court to court martial convictions resulting in military imprisonment, punitive discharge or other penalties. (See, Ex parte Reed, 100 U.S. 13, 25 L.Ed. 538 (1879); In re Grimley, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890); In re Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946); Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950)).

The non-reviewability rule has been applied, not only to military—judicial proceedings (i. e., court martial convictions), but also to military—administrative proceedings, e. g., non-punitive, but involuntary retirement or discharge of military personnel. See, Reaves v. Ainsworth, 219 U.S. 296, 31 S.Ct. 230, 55 L.Ed. 225 (1911); United States ex rel. Creary v. Weeks, 259 U.S. 336, 42 S.Ct. 509, 66 L.Ed. 973 (1922); United States ex rel. French v. Weeks, 259 U.S. 326, 42 S.Ct. 505, 66 L.Ed. 965 (1922); Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953).

Not until 1953 did the Supreme Court indicate relaxation of this non-reviewability rule. In Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), a habeas corpus petition to annul a court martial murder conviction, the court, although it denied the writ, stated that the constitutional guarantee of due process is meaningful enough and sufficiently adaptable to protect soldiers as well as civilians from crude military injustices and that the federal courts have power to determine whether the military have given fair consideration to the petitioner's claims of denial of constitutional due process. The denial of relief was based, as set forth in the main opinion, upon the stated ground that the military had fully and fairly considered all the petitioner's constitutional claims but the four opinions filed in the case [1] read as a

---

1. One concurring opinion (Minton) adhered flatly to the traditional view that the federal courts have no power to review except collaterally for the limited purpose of ascertaining, not constitutional due process, but only jurisdiction in the narrow sense. At the other extreme a dissenting opinion (Douglas and Black) held that review is not limited to "jurisdiction" in the narrow sense but includes consti-

whole, seem to intimate that, if such had not been the case, the court would have reviewed the conviction and that the scope of review would have extended beyond the traditionally narrow concept of jurisdiction to include claims of deprivation of constitutional due process.[2]

Likewise, in 1958, the Supreme Court in Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503, again intimated relaxation of the non-reviewability rule as applied to non-judicial, administrative actions of the military. In that case the Supreme Court set aside an administrative army discharge which had been based on security risk activities occurring prior to petitioner's induction. The Court of Appeals (100 U.S.App.D.C. 190, 243 F.2d 613 [1957]) and the District Court (137 F.Supp. 475 [D.C.1956]) had both denied relief upon the traditional non-reviewability rule as set forth in *Willoughby,* supra. The Supreme Court, however, held that, generally speaking, judicial relief is available to anyone who has been injured by an act of a government official in excess of his express or implied powers. The court proceeded to review and overrule the military's interpretation of a statute and held that the army had in fact exceeded its statutory powers by basing the discharge, not on petitioner's military record alone, but upon civilian activities occurring prior to induction.[3]

Whether and to what extent decisions like Burns v. Wilson, supra, and Harmon v. Brucker, supra, relax the traditional non-reviewability rule and expand the scope of federal court collateral review of military determinations, court martial or administrative, is not yet clear.[4]

In what we believe to be the most recent expression of the Supreme Court

tutional due process within the meaning of the Fifth Amendment and, further, that even "fair consideration" of these constitutional issues by the military does not bar the federal courts from review on the merits.

2. Even before Burns v. Wilson, supra, some inferior federal courts reviewing court martial convictions, had expanded the concept of military "jurisdiction" to include denial of fundamental due process. See, Schita v. King, 133 F.2d 283 (8th Cir. 1943); United States ex rel. Innes v. Hiatt, 141 F.2d 664 (3rd Cir. 1944); Anthony v. Hunter, 71 F.Supp. 823 (D. Kan.1947). Compare, however, Arnold v. Cozart, 75 F.Supp. 47 (N.D.Tex.1948); In re Wrublewski, 71 F.Supp. 143 (D. Cal.1947).

3. It seems, however, that any relaxation of the non-reviewability rule by *Harmon* is more apparent than real. *Harmon* really did little more than hold that the action of the military, basing a discharge upon civilian rather than military activity, was beyond military jurisdiction and, therefore, subject to collateral attack within the meaning of the jurisdiction test long recognized as an exception to the nonreviewability rule. In 1956, two years before *Harmon*, the Supreme Court in Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 had similarly reviewed and set aside a court martial conviction of a civilian on the ground that civilians are beyond court martial juris-

diction. See also, Schwartz v. Covington, 341 F.2d 537 (9th Cir. 1965).

4. As recently as 1957 the Supreme Court, itself, conceded that the extent to which Burns v. Wilson renders the Bill of Rights applicable to military trials has not been clearly settled. (See, Reid v. Covert, 354 U.S. 1, 37, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). In the same year, in Fowler v. Wilkinson, 353 U.S. 583, 77 S.Ct. 1035, 1 L.Ed.2d 1054 (1957), the Court, considering a court martial conviction, seemed to reaffirm the non-reviewability rule in traditional terms, saying that "sentences of court martial * * * cannot be revised by the civil courts save only when void because * * * of the defective exercise of power possessed." That the rationale of federal court review of military determinations is still unsettled becomes evident from reading the text material on this subject. See, e. g., Civilian Judges and Military Justice—Collateral Review of Court Martial Convictions, 61 Columbia L.Rev. Vol. 61, p. 40 (1961); Federal Court Jurisdiction over Courts Martial, Washburn Law Journal, Vol. 1, p. 25 (1960); The Bill of Rights and the Military (Chief Justice Earl Warren), New York University Law Review, Vol. 37, p. 181 (1962); Military Law—A Separate System of Jurisprudence, Cincinnati Law Rev., Vol. 36, p. 223 (1967); God, The Army and Judicial Review, Cal.L.Rev., Vol. 56 (No. 2) p. 379 (1968).

concerning federal court review of military determinations, Beard v. Stahr, 370 U.S. 41, 82 S.Ct. 1105, 8 L.Ed.2d 321 (1962) the court had before it the case of an army officer seeking to enjoin the Secretary of the Army from removing him from the active list (through elimination proceedings under an Act of Congress dealing with dismissal for failure to meet military standards) upon the ground that the Act placed the burden of proof upon the officer, rather than upon the army, and, further, made no provision for confrontation of the witnesses against the officer. A three judge district court, Beard v. Stahr, 200 F.Supp. 766 (D.C.1961) had held that an officer of the armed forces is subject to removal at any time by the President in his discretion, except as such discretion might be limited by an Act of Congress; that since unlimited power to dismiss is inherent in the President unless limited by Act of Congress, it follows a fortiori that any procedure established by Congress for the elimination of officers, who are either surplus or not regarded as meeting high standards, is not limited or controlled by the due process clause or any other constitutional provision and that the supervision and control over the selection, appointment and dismissal of officers are not proper subjects of the judicial function. The Supreme Court in a per curiam opinion vacated the judg-

ment of the three judge district court upon the sole ground, however, that the action had been prematurely brought because the appellant had not yet been actually removed from the army active list.

Recent cases in the Court of Appeal and District Courts in which administrative discharges of military personnel have been challenged for lack of constitutional due process or non-compliance with statutory or rule requirements, have recognized the limited scope of federal court review and have denied relief either upon the ground of non-reviewability or after review upon the merits. See, Brown v. Gamage, 126 U.S.App. D.C. 269, 377 F.2d 154 (1967); Kennedy v. Commandant, 258 F.Supp. 967 (D. Kan.1966). See also, Sohm v. Dillon, 231 F.Supp. 973 (D.C.1964) and 235 F.Supp. 450 (D.C.1964), rev'd in Sohm v. Fowler, 124 U.S.App.D.C. 382, 365 F.2d 915 (1966); but solely to order stay of proceedings pending military review; Reed v. Franke, 297 F.2d 17 (4th Cir. 1961); Richards v. Cox, 184 F.Supp. 107 (D.C.Kan.1960) (a court martial case). Compare, however, Ashe v. McNamara, 355 F.2d 277 (1st Cir. 1965), which granted relief after a review of a court martial conviction for fundamental unfairness (denial of effective assistance of counsel), citing Burns v. Wilson, supra and Harmon v. Brucker, supra,[5] and [6]

5. Relief was denied in Reed v. Franke, supra, despite the absence of a provision for a fact finding hearing before discharge; in Kennedy v. Commandant, despite no provision for right to be furnished counsel; in Dunmar v. Ailes, 121 U.S.App.D.C. 45, 348 F.2d 51 (1965), despite no requirement for assistance of counsel or for presentation of evidence or for cross-examination of witnesses; in Brown v. Gamage, despite claim of denial of opportunity to confront witnesses.

6. The Court of Claims, passing upon claims of former military personnel for back pay and similar benefits, has exercised a power of review over military decisions whenever necessary in order to determine whether action of the military adversely affecting such claims was valid, i. e., within the jurisdiction of the military. Many of these cases have expanded the con-

cept of jurisdiction to include procedural due process and have granted or withheld relief accordingly. This power of the Court of Claims may have been questionable in the light of pre-Burns v. Wilson cases but it has been exercised since Shapiro v. United States, 69 F.Supp. 205, 107 Ct.Cl. 650 (1947) and is now justified by reference to Burns v. Wilson. See, Shaw v. United States, 357 F.2d 949, 953, 174 Ct.Cl. 899 (1966). See also, Juhl v. United States, 383 F.2d 1009, 181 Ct.Cl. 210 (1967); Hertzog v. United States, 167 Ct.Cl. 377 (1964); Egan v. United States, 158 F.Supp. 377, 141 Ct.Cl. 1 (1958); Friedman v. United States, 158 F.Supp. 364, 141 Ct.Cl. 239 (1958); Augenblick v. United States, 377 F.2d 586, 180 Ct.Cl. 131 (1967).

The question of the power of the federal courts to review administrative determina-

In our opinion cases like Burns v. Wilson and Harmon v. Brucker seem to indicate that, although there may be doubt as to the scope of review, the Supreme Court is prepared to relax the traditional non-reviewability rule sufficiently to admit ultimate, collateral federal court review of claims by military personnel of denial of constitutional due process in such matters as court martial convictions [7] which involve life, liberty or other penalty, and administrative discharges from the services which involve their quasi property rights.

It can be argued that officers and servicemen, upon termination of their service, have a quasi property right to have their discharges properly reflect their military record because if such discharges improperly and adversely reflect the military record they might stigmatize the dischargee and adversely affect his civilian future.

Neither of these situations, however, is presented in our pending case. As already noted, the issue here is much narrower, namely, judicial review of such purely internal, administrative matters as duty assignment and promotion.

 We are of the opinion that the traditional non-reviewability rule should be followed and applied at least where, as in this case, the military decision affects, not the life, liberty or some property right of the petitioner, but only his duty assignment or promotion status. We know of no case in the Supreme Court or in the lesser federal courts which has gone so far as to interfere with naval or army decisions of this particular kind for any reason whatsoever. On the contrary, it has been consistently held by the Supreme Court, for example in Orloff v. Willoughby, supra, that "it is not within the power of this Court by habeas corpus to determine whether specific assignments to duty fall within the basic classification of petitioner. * * * [T]here must be a wide latitude allowed to those in command. * * * [W]e have found no case where this Court has assumed to revise duty orders as to one lawfully in the service." 345 U.S. 83, 93–94, 73 S. Ct. 534, 540, 97 L.Ed. 842.

Similarly, with respect to promotion status, the Supreme Court in Reaves v. Ainsworth, supra, holding that qualification of an officer for promotion cannot be reviewed, said "to be promoted * * may be the right of an officer, the value to him of his commission, but greater even than that is the welfare of the country and, it may be, even its safety through the efficiency of the Army." 219 U.S. 296, 306, 31 S.Ct. 230, 234, 55 L.Ed. 225.

In Luftig v. McNamara, 252 F.Supp. 819 (D.C.1966) the district court dismissed an action brought by a member of the Army to enjoin it from ordering him to the Vietnam war theatre. Although one ground for dismissal was that the court had no power to determine a political question, a further ground was that courts may not substitute their

---

tions by the military has also been raised in a series of cases in which army or navy personnel have challenged on constitutional or statutory grounds military administrative disapproval of their applications for conscientious objector status. In those cases the courts, generally recognizing and applying the non-reviewability rule, have denied relief. See, Brown v. McNamara, 387 F.2d 150 (3rd Cir. 1967); Chavez v. Ferguson, 266 F. Supp. 879 (N.D.Cal.1967); Gilliam v. Reaves, 263 F.Supp. 378 (W.D.La.1966); In re Kanewske, 260 F.Supp. 521 (N.D. Cal.1966). But see, Crane v. Hedrick, 284 F.Supp. 250 (N.D.Cal.1968); Gann

v. Wilson, 289 F.Supp. 191 (N.D.Cal. 1968); Hammond v. Lenfest, 398 F.2d 705 (2d. Cir. 1968).

7. The Uniform Code of Military Justice, Title 10 U.S.C. § 876 makes court martial convictions "final and conclusive" upon the courts but this does not seem to preclude ultimate collateral civil court review on habeas corpus, or other analogous collateral attack, e. g., suit in the Court of Claims, See, Augenblick v. United States, 377 F.2d 586, 593, 180 Ct.Cl. 131 (Ct. Claims, 1967) or possibly even Declaratory Relief raising lack of court martial jurisdiction. See Brown v. Royall, 81 F. Supp. 767 (D.C.1949).

judgment for that of the Commander in Chief concerning disposition of the armed forces, citing Beard v. Stahr, 200 F.Supp. 766, supra.[8]

Any attempt of the federal courts, absent some direction or permission from the Congress to do so, to take over review of military duty assignments, commands and promotions would obviously be fraught with practical difficulties for both the armed forces and the courts.

It is not necessary, however, to base the decision of this case upon the non-reviewability rule. For the purpose of this case we will assume that this court should review the kind of naval decisions here involved and we will further assume that on such review this court should extend its review beyond the narrow test of military jurisdiction to include constitutional due process.

So far as constitutional due process is concerned, the Navy decisions here in question did not deprive plaintiff of his life or liberty through any punitive measures against him. The only possible constitutional question would be whether they operated to deprive plaintiff of a property or quasi property right within the meaning of the Fifth Amendment.

■ But, a member of the armed forces has no property right in any particular command or duty assignment or promotion during his service any more than has a civil service employee any such right. In cases involving civil service, judicial review of administrative dismissals, duty assignments and promotions is narrowly limited to the question whether the governmental agency has

properly interpreted and substantially complied with any pertinent statute regulating assignment or promotion. The test is, not constitutional due process, but only substantial compliance by civilian superiors with such statutory requirements. Powell v. Brannan, 91 U.S.App. D.C. 16, 196 F.2d 871 (1952). Seebach v. Cullen, 224 F.Supp. 15 (N.D.Cal.1963), aff'd 338 F.2d 663 (9th Cir. 1964); Mancilla v. United States, 382 F.2d 269 (9th Cir. 1967); Cutting v. Higley, 98 U.S. App.D.C. 288, 235 F.2d 515 (1956).

■ For obviously stronger reasons military decisions concerning internal duty assignments and promotions must be left, absent Congressional regulation to the contrary, to the judgment of chain of command under the President as Commander in Chief. If reviewable at all by the federal court, the only possible question would be whether, as alleged by plaintiff in this case, certain procedural Navy Regulations were violated. In order to answer this question we proceed to examine plaintiff's allegations.[9]

## REVIEW ON THE MERITS

Plaintiff alleges that his detachment from the command of the Vance was the result of a conspiracy between his subordinate officers, among them his operations officer, Lieutenant Generous, his operations officer, Lieutenant Hardy (Complaint X), and his superior officers, among them Admiral Irvine and Admiral King and Commander Milligan.

■ The issue, however, is not possible conspiratorial motivation by plaintiff's fellow officers, but only whether

---

8. As recently as October 7, 1968, the Supreme Court by a vote of 8 to 1 refused to stay duty assignment of army reservists to the Vietnam war theatre.

9. On September 29, 1968, this court set aside the submission of defendant's motions—reopened the hearing and directed defendant to make the transcript of the Witter investigative proceedings a part of the record herein. This was done. The transcript is now defendant's Exhibit G. At the court's request defendant has also filed, October 4, 1968, a memorandum

summarizing pertinent parts of the transcript.

Since the record goes beyond the complaint, defendant's motion to dismiss will be treated (as allowed by Rule 12) as a motion for summary judgment. Rule 56 provides that on a motion for summary judgment the adverse party (plaintiff in this case) may not rest upon the mere allegations of his pleading but his response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. The record will be viewed in this light.

plaintiff's detachment was, nevertheless, accomplished and subsequently approved in substantial conformity with regulations, regardless of motivation.

Plaintiff alleges that his subordinate officers, among them Lieutenant Generous and Lieutenant Hardy, and others, among them Chaplain Osterman, Commander Baird, Commander Milligan, Chaplain Lieutenant Dando, Lieutenant Kordon and Commander Milligan, made and forwarded critical reports concerning him to others without notifying him in intentional and knowing violation of Navy Regulations 1212, 1243.2, 1243.3 and 1404.1 which deal with the making of critical reports concerning officers.

■ The issue, however, is not violation by others of such regulations, but only whether plaintiff, notwithstanding, was removed and his removal subsequently approved, in substantial compliance with the regulations pertaining to removals from command—regardless of alleged violation of other rules by plaintiff's fellow officers.

Further, as we will presently point out, the subject matter of these critical communications, allegedly made to others without notice to plaintiff, was ultimately investigated at the Witter hearing.

Plaintiff alleges that his superior officers, Admirals Irvine, King and Semmes, accomplished his summary removal in violation of Naval Personnel Manual C–7801–4. (Def.'s Ex. D). The Manual, however, expressly authorizes requests by superior officers to Bureau of Naval Personnel for summary detachment of subordinate officers from duty whenever speed is mandatory because of any emergency, impending deployment of the ship or squadron to which the officer is attached, or other urgent reasons. In the pending case, summary detachment was requested by Admiral Irvine and ordered by Admiral Semmes, Chief of Bureau of Naval Personnel, because they believed that such emergency existed.

The Manual provides that in such case the request for removal from command may be preliminarily made by message,

stating briefly the reasons and the nature of the urgency; that appropriate action will then be taken by Chief of Naval Personnel but that "final action" will be taken by him only on the basis of a subsequent letter which, together with the statement of the officer in question, can be made a part of his official record.

In the pending case an investigation of the summary removal was promptly convened and the subsequent letter from Admiral King, together with the Witter investigation report, was forwarded to the Chief of Naval Personnel via Admiral Baumberger, who first made these letter reports available to Arnheiter for his rebuttal statement. Arnheiter then presented his rebuttal statement, dated August 5, 1966 (Def.'s Ex. H), consisting of over 500 pages including the attached exhibits. On August 30, 1966, the letter of Admiral King and the Witter report, together with the Arnheiter rebuttal statement, were forwarded by Admiral Baumberger to Chief of Naval Personnel for final action and on September 9, 1966, this final action was taken by Admiral Semmes, Chief of Naval Personnel, approving "for cause" Arnheiter's previous summary dismissal from command.

Clearly, these procedures were in substantial compliance with the provisions of the Manual covering summary detachments from command.

■ Plaintiff alleges, however, that Admiral Irvine did not comply with the provisions of Naval Personnel Manual C–7801(4) (c), 1, 2, 3, and 4, containing what are obviously directory, policy provisions concerning responsibilities of command officers in making requests for detachment of officers. Admiral Irvine's affidavit avers that consideration was given to each of those provisions. Assuming, however, that Admiral Irvine, either from poor judgment or through inadvertence, failed to comply with these provisions prior to making his request, such failure would not invalidate the summary removal by Admiral Semmes, Chief of Naval Personnel (in whom was then vested the power to act on such requests) if, in fact, the summary re-

moval was thereafter fairly investigated and cause for the removal found.

Plaintiff alleges that the Witter informal one-officer investigation was convened in violation of regulations and without due process. Navy Regulations, 32 CFR 719.254 et seq., authorize three kinds of fact-finding bodies: (1) Courts of Inquiry; (2) Boards of Investigation (formal or informal), and (3) One-Officer Investigations (formal or informal). An informal one-officer investigation was convened by Admiral King in this case.

The Regulations, 32 CFR 719.255, expressly leave the type of fact-finding body to be ordered in any particular situation to the "judgment and sound discretion of officers in command" under general guidelines set forth in the regulations.

■ The record shows beyond genuine dispute that the convening by Admiral King of a one-officer investigation was within the prescribed guidelines and, further, was a purely discretionary choice with which the court should not interfere.

Plaintiff contends, however, that procedural provisions of the Judge Advocate General's Manual were violated during the course of the investigation. This Manual provides that an "informal one-officer investigation" such as was convened in this case, is governed by the same rules and regulations as are prescribed for "an informal board investigation" (which consists of two or more officers—32 CFR 719.601) insofar as those rules and principles can be applied to a one-officer investigation (32 CFR 719.611, 612)—provided that "the mission of the officer must be given primary consideration in the determination of procedural questions not covered by the sources of guidance."

Navy Regulations, 32 CFR 719.601, 610, provide in substance and effect that such informal boards have considerable latitude in the methods they may employ to elicit information; that testimony may be taken in any fair manner; that cross-examination must be exercised within the practical limits set by the method of interrogation, that evidence and information may be obtained by such means as formal testimony of witnesses, informal personal interview, correspondence and telephone inquiry; that a party and his counsel shall be permitted to examine such evidence or information as will be considered in the report and to present further evidence or information or to suggest other lines of inquiry; that after all available evidence has been received and after the party has had a reasonable time to examine any evidence not received in his presence and to present the evidence he may desire, the party or his counsel may make an unsworn statement, either orally or in writing and may make an argument; that an investigative report in letter form shall be submitted by the investigating officer.

Although Arnheiter as a "subject to inquiry" was designated as a "party" to the investigation, pursuant to 32 CFR 719.301(a) (b) and 302, the fact-finding investigation which was here convened by Admiral King, was not a trial of Arnheiter. Rather, these investigations are purely an administrative fact-finding investigation designed to provide the convening and reviewing authorities with adequate advisory information upon which to base decisions (See, 32 CFR 719.251(d))—in this case an ultimate "final action" by Chief of Naval Personnel on Arnheiter's summary removal.

Plaintiff alleges that he was "not shown evidence favorable to him gleaned from the Milligan preliminary investigation." The record shows, however, as already noted, that statements taken from crew members by Milligan during his preliminary investigation were turned over to Witter and that Witter reviewed these statements with plaintiff and his counsel prior to the taking of evidence. (See, Witter Report, Def.'s Ex.K). (See also, Def.'s Ex. G, p. 60).

Plaintiff alleges that he was not told "which of the accusations furnished him by Witter had caused his removal or were to be the basis of the investigation." Although there is no requirement for for-

mal charges in a non-judicial fact-finding investigation of the kind here involved, plaintiff's allegation impliedly concedes that he was, nevertheless, at the outset of the hearing presented by Witter with the crew statements preliminarily obtained by Milligan which were for practical purposes the basis of the investigation.

Plaintiff alleges that Witter, as investigating officer, "considered" certain accusatory statements—a Chaplain Dando letter to Milligan of March 26, 1966; a communication from Lieutenant Generous and a communication from a Lieutenant Kordon of which plaintiff was not made aware.

■ Apart from plaintiff's bare allegation, plaintiff has not set forth in the present record on motion for summary judgment any specific evidentiary matter to show that Captain Witter "considered" any of these communications or that his findings were based thereon.

The record shows that on July 15, 1966, three months after the investigation, the Dando letter was still in the hands of Milligan (to whom it had been originally handed), not Witter, and that it was Milligan who forwarded it on that date to Admiral Baumberger. (See Milligan letter of July 15, 1966, Part of Pltf.'s Ex. E).

■ Assuming, however, that Witter did "consider" some of these communications, that fact would not amount to a substantial or prejudicial departure from regulations if in fact substantially the same accusations were made known to Arnheiter through the statements reviewed with him and his counsel by Witter before the hearing and through the testimony of his critics at the hearing. The record shows that both Chaplain Dando and Lieutenant Generous were called by Witter to give their sworn testimony at the hearing in the presence of Arnheiter and his counsel. The subject of the Kordon communication was covered by other witnesses (Def.'s Ex. G, p. 349–355, 456–465).

The record also shows that the subject matter of these communications was substantially covered at the hearing at which the Generous communication was gone into. (Def.'s Ex. G, pp. 63, 306, 400). Incidentally, the record indicates that plaintiff must have had this particular communication in his own possession during the hearing and that copies of his communication were included in Arnheiter's rebuttal statement of August 5, 1966. (Def.'s Ex. H, Vol. I, pp. 129, 210).

The various subject matters of the Dando letter of March 26, 1966, appear throughout the transcript of the Witter hearing. (See re this, citations to the transcript listed in Defendant's Memorandum, filed October 4, 1968, Part V, p. 23–25).

The subject of the Kordon communication was also fully investigated at the hearing. (Def.'s Ex. G, pp. 64; 349–351; 356; 456–465).

Without giving any specific instance, plaintiff alleges generally that he was "not permitted to present witnesses in his own defense or to introduce their signed statements" in violation of 32 CFR 719.304(a) (5), providing that a party has the right to produce evidence. The record of the investigation discloses no such instance—with two possible exceptions, Def.'s Ex. G, pp. 429, 347) and a possible third exception mentioned in the Arnheiter rebuttal of August 5, 1966 (Def.'s Ex. H, p. 58). In none of these instances was there any abuse of discretion or any prejudice to plaintiff. As a matter of record plaintiff did present statements of witnesses in his own behalf. (Def.'s Ex. G, pp. 430–431).

Plaintiff makes the narrowly restricted allegation that he was not permitted to "recall hostile witnesses" or given "reasonable" scope in cross-examination of such witnesses. This allegation impliedly concedes that he was permitted to examine and cross-examine witnesses. An examination of the record of the investigation (Def.'s Ex. G) shows comparatively few instances of this kind. (See, pp. 316, 318, 346, 359, 332, 407, 408, 410,

412) and convincingly demonstrates that plaintiff was given ample latitude and that the investigation officers' exercise of discretion was reasonable. Plaintiff was permitted to cross-examine Lieutenant Hardy for two days (Def.'s Ex. G, pp. 291–364).

Although the record is devoid of any objection by plaintiff to Lieutenant McGovern, his counsel, or any request for different counsel, plaintiff now complains that his counsel had no previous experience as a shipboard officer. The record shows, however, that Lieutenant McGovern was a duly qualified attorney certified to perform even court-martial duties, (Def.'s Ex. J) and that the provision of counsel for plaintiff complied with 32 CFR 719.304(b).

Plaintiff alleges that Admiral Semmes, Chief of Naval Personnel did not personally review the investigative reports before approving plaintiff's removal for cause. Apart from the Admiral Semmes' affidavit, stating that he did carefully review it, the record does show that, acting on information satisfactory to him, he personally approved the removal by his signed memo of September 9, 1966.

Plaintiff further alleges that Admiral Semmes forwarded the memo of his decision, approving Arnheiter's removal "for cause," to the Selection Board to be placed in Arnheiter's record in violation of Manual C–7801(5) (b). However, the Manual C–7801(4) (d) (2), expressly provides that "final action" on removal of an officer from command can be made a part of his record if accompanied by the officer's statement. The September 9, 1966 approval by Chief of Naval Personnel of Arnheiter's detachment was the "final action" and the memo thereof was accompanied by Arnheiter's rebuttal statement.

Plaintiff, relying on 32 CFR 719.260 (a) providing for a record of proceedings in investigations of this kind, alleges that Witter "scrubbed the tape of testimony at the hearing." The record shows that one of 13 reels of tape (tape 10) failed mechanically and did not record (Def.'s G. p. 61) and the testimony had to be reconstructed by Witter (Def.'s Ex. G, p. 351). Plaintiff's allegations on this point are obviously beyond his own testimonial knowledge and he has presented no specific evidentiary matter on this summary judgment motion to support it. The record negates any substantial noncompliance with regulations or any prejudice to plaintiff on this point.

Plaintiff now alleges that Captain Witter, the investigating officer, was biased against him. The record fails to show, however, that this claim was reported to the convening authority for appropriate action as required by 32 CFR 719.514, or that it was ever raised either at the hearing or in plaintiff's rebuttal statement. The point, if reviewable at all, has been waived.

Summarizing, the record, as here presented, shows beyond genuine dispute that the circumstances surrounding plaintiff's summary removal from command were promptly investigated, reported, reviewed through chain of command and that the removal was finally approved for cause, in substantial, if not literal, conformity with Navy Regulations—including advice as to rights, representation by counsel, open hearing, confrontation with witnesses, opportunity for cross-examination, presentation of rebuttal evidence and review of the record by at least four superior officers—Rear Admirals King and Baumberger and Vice Admirals Johnson and Semmes—and finally by the Judge Advocate General and Secretary of the Navy—the latter being the civilian representative of the President as Commander in Chief of the armed forces.

The alleged procedural irregularities, considered singly or in combination, are insufficient to raise a genuine issue of fact on the question of substantial compliance with the Navy Regulations applicable to this informal one-officer investigation.

If this court were empowered to sit in appellate review of the military proceedings here involved, it could, of course, reverse for any prejudicial error.

However, this court has not been given any such power of direct review. If this court has any power at all to review the kind of proceedings here involved, such review is collateral only and, therefore, limited to such irregularities as would in effect render the Navy's decision wholly invalid and beyond its jurisdiction. Procedural errors, even those which might have prejudicially affected the outcome of the proceedings, would not justify interference by this court unless they constitute such substantial non-compliance with Navy Regulations as would be, not only prejudicial, but of such constitutional magnitude as amounts to deprivation of fundamental due process of law under the circumstances.

What constitutes fundamental due process must be determined within the context of each particular situation—in this case within the context of purely internal, administrative, non-punitive Navy action concerning duty assignment and promotion status. We find no genuine issue of either non-compliance with pertinent regulations or deprival of due process of law in this case.

It may be that, as contended by plaintiff and others on his behalf, the Navy made a mistake of judgment in his case with consequent disappointment, even justifiable resentment on his part. But, to say that his removal from the Vance was not thoroughly and fairly investigated and reviewed before final approval, is quite another matter. The thoroughness and substantial fairness of the investigation and review are not only evident but quite impressive.

It may be that Arnheiter's superior officers made a mistake in judgment in requesting his summary removal from the Vance. It may be that the findings made and reviewed on subsequent investigation could have been otherwise—but there was evidence to support them. It may be that Arnheiter could nevertheless have been reassigned to another destroyer escort for further assessment of his abilities—as was recommended at one point by Admiral Baumberger and as argued by others on Arnheiter's behalf.

 These matters, however, are internal, administrative matters involving the judgment of Naval command concerning duty assignment and promotion under Vietnam war conditions. It is not for this court to substitute its judgment for that of the Navy or to order the Navy to again review what this court finds to be action clearly within its powers, in substantial conformance with regulations and well within the bounds of fundamental due process as applied to internal, administrative non-punitive naval matters.

For the reasons set forth herein the motion of defendant, Secretary of the Navy, for summary judgment in his favor is hereby granted.