**Marcus COVINGTON, Jr., Plaintiff-Appellant,**

**v.**

**Donald ANDERSON, Adjutant General of the Military Department of the State of Oregon, et al., Defendants-Appellees.**

**No. 72–1085.**

United States Court of Appeals, Ninth Circuit.

Nov. 12, 1973.

Merrill, Circuit Judge, dissented and filed opinion.

Don H. Marmaduke, Charlen Merten (argued), Portland, Or., for plaintiff-appellant.

Lee Johnson, Atty. Gen., E. Nordyke, Asst. Atty. Gen., Portland, Or., John W.

Osburn (argued), Salem, Or., for defendants-appellees.

Before MERRILL and TRASK, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

This appeal is from an order granting summary judgment in favor of defendants-appellees in an action by plaintiff-appellant, Marcus Covington, Jr., seeking declaratory and injunctive relief and damages for his suspension from flight status as a jet pilot with the Oregon Air National Guard (OANG). The defendants-appellees are officials of the Oregon Military Department.

Defendants filed a motion to dismiss [1] and, in the alternative, for summary judgment, basing their motion for summary judgment on the pleadings, a supporting memorandum, and numerous exhibits. In opposing the motion plaintiff relied upon the complaint, his affidavit, depositions of defendant-appellee Doolittle and three other officers of the Oregon National Guard, and a supporting memorandum. Following a hearing the court entered an order reading: "Defendants' motion for summary judgment is hereby granted." [2]

*Factual Background*

On January 7, 1971 the United States Department of Defense issued an order directing all Air National Guard units to reduce jet pilot strength to "authorized" levels by February 28, 1971. In Oregon this required a reduction from 38 to 34 pilots.

By direction of General Doolittle, Chief of Staff of the Oregon Air National Guard, Lt. Col. R. J. Schmidt, Commander of the 142d Fighter Group, wrote a letter on January 27, 1971 to all of the jet pilots informing them of the reduction order, requesting immediate notice from any pilot who contemplated early retirement, resignation, or transfer, and stating that "the next, and obvious step" would be "selection of pilots for involuntary separation." This would be done "by a special committee * * * representing all elements of the Squadron and Group". It was explained that the committee's determination would be based on the pilot's "total member" value, defined as "past performance as a pilot, an officer, and a participant in organizational activities, plus an estimate of future potential based on age, grade, current professional training, participation, civilian occupation and availability in the event of State or Federal emergencies."

There was no response to this letter from any of the pilots. On February 12, 1971 General Doolittle formed a "committee" of seven subordinate officers, all jets pilots potentially subject to suspension, to evaluate the pilots and recommend six for involuntary separation, not later than February 17, 1971.[3]

---

* Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

1. As grounds for the motion to dismiss, defendants claimed failure to join indispensable parties, sovereign immunity, and failure to state a claim upon which relief could be granted. Since we are affirming the summary judgment we need not consider the issues raised by the motion to dismiss.

2. It is recognized that a summary judgment is proper only where there is no genuine issue of a material fact or where viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law. Appellant does not contend that there is any genuine issue of a material fact. Rather he argues that under the undisputed facts the case should be remanded and summary judgment entered in his favor.

3. In an affidavit in support of the motion for summary judgment Doolittle stated that the "committee was an informal committee to assist me in making a decision as to those pilots who were to be removed from flight status pursuant to the Order of the Department of Defense". In his deposition Doolittle stated that he considered the group a "committee" rather than a "board * * * to evaluate somebody for misdoings, or a board to investigate problems"; that he "could have picked all of these peo-

The committee met on February 13 and 14, with six voting members and one non-voting member acting as recorder. They excluded from consideration for suspension General Doolittle, Lt. Col. Bergen, who had just assumed command of the fighter squadron, and the members of the committee. All other pilots were discussed both favorably and unfavorably, but no personnel records or other written or documentary material were considered by the committee.

On February 14 the committee submitted its written report and, as instructed, recommended six pilots for involuntary separation, listing the six names in order of its preference for suspension, with Covington's name appearing second.[4] Doolittle decided not to accept the first name recommended,[5] but accepted the committee's recommendations on the next four pilots.

On February 18, 1971 Covington was notified by letter that he was "one of four pilots selected" and that he was "suspended from flying" effective that date. The notice stated that the "Selections considered all aspects of each pilot's total participation, production, availability and comparative potential in the program". Covington was given "the option of being assigned to a non-rated [non-flight] position or being separated from the Oregon ANG". Coving-

ton chose the first alternative and effective February 28, 1971 was reassigned to the position of civil engineering staff officer.

On March 4, 1971 the Assistant Adjutant General (Air) of the Oregon National Guard requested the Chief of the National Guard Bureau to suspend plaintiff and three other pilots "from flying status effective 22 February 1971 because of reassignment to non-rated positions". On March 12, 1971 by Order of the Secretaries of the Army and the Air Force Covington was officially suspended from flying status by the Chief of the National Guard Bureau.

### Contentions of Parties

In urging remand and entry of summary judgment in his favor, appellant contends that (1) officials of the Air National Guard violated Air Force Regulation No. 11–1 when they caused appellant "to lose his position as a jet pilot without a hearing and on the basis of an investigation by a board that (was) not impartial"; and (2) state officials, in reducing the peace-time strength of the state's Air National Guard for economic reasons, may not, in the absence of exigent circumstances, "constitutionally cause a jet pilot to lose his position without affording him any procedural due process".[6] Appellees contend that

---

ple myself and not bothered anybody else," but he was "tired of doing that kind of work". He considered pilot reduction a "shame" because the group had just won an award as "the best unit in the United States" and he considered all of the pilots "top notch people".

4. The report on Covington reads:
   "This officer does not possess the dedication standard desired for an OreANG pilot. He has a record of prolonged absence from UTAs. Pilot performance is minimum satisfactory. He is somewhat reluctant to follow orders and has a history of departure from prudent pilot practices."
   The concluding paragraph of the report reads:
   "All of the OreANG jet pilots were considered by this evaluation committee. As you know, these six officers have contributed to the recent successes of this group to include outstanding flying achievements

and superior flying safety record. They are clearly not much worse, in general, than many other officers we considered. We were forced to be hypercritical to separate the six from the rest of the group. The resultant priorities of our comments is an amplification of weaknesses felt necessary to make our decisions."

5. This decision was based on the fact that Doolittle had heard this officer "was moving out of the area" and would be "taken care of in a different way".

6. Appellant argues that the summary judgment in his favor should declare "that he was deprived of the procedural due process required by AFR 11–1 and the United States Constitution", require appellees "to rescind their action causing his suspension from flying status until proper procedures are followed", and require appellees "to pay or cause to be paid" to appellant the back pay lost by reason of his flight suspension.

(1) Air Force Regulation No. 11–1 "has no application to the exercise of discretionary authority to reassign or detail officers to duties other than flight duty"; and (2) "The exercise of the authority to appoint, assign, reassign, transfer or detail to and from units within the organized militia is discretionary and not subject to judicial review."

### Air Force Regulation No. 11–1

■ Air Force Regulation No. 11–1 (AFR 11–1) prescribes administrative practices for "the conduct of investigations by boards of officers". The "primary duty of a board is to develop and consider the evidence concerning the matter under investigation, to arrive at clear, consistent findings and, where required, to make recommendations."

Paragraph 6a of the regulation provides that "In every case in which the conduct, efficiency, fitness, or pecuniary liability of any person is to be investigated" the person concerned must be given written notice of the investigation "at a reasonable time in advance of the convening of the board". Paragraph 10a provides:

"A person whose conduct, efficiency, fitness, or pecuniary liability is under investigation will be extended the privilege of counsel, as provided in paragraph 8, will be permitted to be present at all open sessions of the board, to cross examine witnesses appearing against him, and to call witnesses and present evidence in his own behalf."

Paragraph 17 provides that "In all cases covered in paragraph 6a", the report of the proceedings shall be "submitted to the staff judge advocate for review as to legal sufficiency" before final action can be taken by the commanding officer.

It is undisputed that the committee appointed by General Doolittle did not conduct a hearing or otherwise comply with the procedures prescribed by AFR 11–1.[7] We agree with appellees, however, that the regulation was not applicable to the procedures followed by the committee in recommending that appellant and three other pilots be suspended from flight status in compliance with the directive to reduce the jet pilot strength to the "authorized" level.

Considering the regulation in its entirety, it seems clear that it was intended to apply to investigations as a result of a charge of misconduct or where findings of the board may lead to a formal charge. Here there was no charge of malfeasance, misfeasance, lack of technical flying skill, or any other personal or technical deficiency.[8] It is true, as appellant argues, that the committee considered his "conduct, efficiency, and fitness", but this was for the sole purpose of making recommendations to comply with the directive to reduce the number of pilots to the authorized strength of the unit.[9]

---

7. Appellant complains, inter alia, that he was not granted the opportunity to present evidence in his own behalf or rebut unfavorable comments of the committee and that the committee failed to consider evaluations in his instrument and flying proficiency reports and Officer Effectiveness Reports. He claims that he lost a position which would enable him to earn $550 per month, that his retirement benefits were reduced, and that he has been damaged in his professional proficiency and career qualifications.

8. In his deposition General Doolittle testified in part:

"Q On matters of this kind, I take it that the National Guard Bureau does follow the State's recommendation, does it not?

"A In matters of this kind where they were suspended only because there was an overage, where no malfeasance or no malperformance, there was no—there was no misconduct or anything of this nature, or lack of flying skill, the suspension was not as the result of any personal or technical deficiency, it was just a requirement to reduce the number of people.

"Q Well, all right. They do follow the recommendations of the State in such circumstances?

"A When it is just a reduction in force, yes."

9. General Doolittle testified that he was not concerned with the evaluation of the committee: "I was interested in four names, I didn't care whether they shot dice to get them."

There was no regulation requiring the appointment of the committee. General Doolittle himself could have selected four pilots for suspension from flight status, free from the requirements of AFR 11–1, and without, as he put it, bothering anybody else. As will be discussed *infra,* Doolittle's action would not have been subject to judicial review, even if arbitrary.[10]

We conclude, as the district court apparently did, that AFR 11–1 did not apply to the committee's recommendation that appellant be suspended from flight status.

### Reviewability of Military Decisions

Appellant next contends that in the absence of exigent circumstances necessitating summary action, an air national guard pilot is entitled to a hearing before he may be removed from his position by state officials as part of a peacetime economy measure, and that the procedure here followed violated his due process rights under the Fourteenth Amendment.

In considering the reviewability of the action taken in this case, we note at the outset that the right of an air national guard pilot to seek judicial review is the same as that of any member of the Armed Forces of the United States. Under Art. I, § 8, cl. 16 of the Constitution of the United States, Congress is vested with the power to "provide for organizing, arming and disciplining the Militia [now National Guard], and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." Congress enacted appropriate legislation pursuant to Art. I, § 8, cl. 16.[11] "The Guard is an essential reserve component of the Armed Forces of the United States, available with regular forces in time of war." Gilligan v. Morgan, 413 U.S. 1, 6, 93 S.Ct. 2440, 2444, 37 L.Ed.2d 407, 413 (1973).

■ As a general rule, military administrative decisions are not subject to judicial review, except for the single inquiry of whether the military had jurisdiction of the subject matter and person and acted in accordance with military law. Arnheiter v. Ignatius, 292 F.Supp. 911, 917 (N.D.Cal.1968), aff'd, 435 F. 2d 691 (9 Cir. 1970).[12] In an exhaustive review of the case law, the district court in *Arnheiter* concluded that "the Supreme Court is prepared to relax the traditional non-reviewability rule sufficiently to admit ultimate, collateral federal court review of claims by military personnel of denial of constitutional due process in such matters as court martial convictions which involve life, liberty or other penalty, and administrative discharges from the service which involve their quasi property rights." *Id.* at 920. Here there was no court martial, discharge or challenge to military jurisdiction. Although appellant argues that the committee violated military law, AFR 11–1, we have concluded that this regulation is not applicable.

---

10. It may be noted also that if AFR 11–1 were applicable to appellant, it would also be applicable to all pilots in the group. No charges had been filed against any of them. In the comparative evaluations to determine the six to be recommended for flight suspension, presumably it would have been necessary to conduct hearings (with the privilege of representation by counsel, right of cross-examination, and review by the staff judge advocate) on over 30 pilots within a little more than a month, in order to comply with the order of the Defense Department to reduce the jet pilot strength by February 28, 1971.

11. 32 U.S.C. § 101 et seq.

12. This was an action by a Navy officer seeking to have the federal court direct the Secretary of the Navy to convene a court of inquiry or other appropriate hearing pursuant to Navy regulations to investigate circumstances surrounding the officer's relief from command of a destroyer escort ship assigned to duty in waters off Vietnam. The court granted defendants' motion for summary judgment of dismissal.

■ As recognized in *Arnheiter, supra* at 920–921, change in duty assignments are subject to the non-reviewability rule. We agree with the court in that case that "Any attempt of the federal courts, absent some direction or permission from the Congress to do so, to take over review of military duty assignments, commands and promotions would obviously be fraught with practical difficulties for both the armed forces and the courts." [13] *Id.* at 921.

This court (Arnheiter v. Chafee, 435 F.2d 691) affirmed so much of the district court's opinion in Arnheiter v. Ignatius as held that the federal courts have no jurisdiction. We quoted from Orloff v. Willoughby, 345 U.S. 83, 73 S. Ct. 534, 97 L.Ed. 842 (1953), where the Court said in part:

> "The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. While the courts have found occasion to determine whether one has been lawfully inducted and is therefore within the jurisdiction of the Army and subject to its orders, we have found no case where this Court has assumed to revise duty orders as to one lawfully in the service." 345 U.S. at 94, 73 S.Ct. at 540.[14]

■ We conclude that the decision to recommend the suspension of appellant from flight status under the circumstances of this case is not subject to judicial review.

Affirmed.

MERRILL, Circuit Judge (dissenting):

It is undoubtedly true that General Doolittle could have discharged his duty to reduce jet pilot strength in a manner not involving the convening of a "board of officers." In my view, however, the manner chosen by him did result in the convening of such a board with quasi-judicial functions which, through its "report," has made findings prejudicially reflecting on appellant's "conduct, efficiency and fitness." This is precisely the kind of consequence which Air Force Regulation 11–1 says should occur only in the presence of some basic procedural safeguards, not provided here. It was on the basis of the report that appellant was suspended from flight status. In my view the authority of the committee to make such a report sufficiently establishes that appellant was "under investigation" in these respects to entitle him to the rights and privileges extended by Regulation 11–1.

Since it appears to me that this military body has ignored its own regulations, I would hold that a cognizable claim of denial of procedural due process is presented, and would reverse and remand for further proceedings.

13. See also cases cited and discussed in *Arnheiter, supra* at 917–921.

14. Appellant argues that the authority of *Orloff* has been substantially impaired by Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958). *Harmon*, however, is distinguishable. It involved the question of whether the Secretary of the Army in issuing less than "honorable" discharges had exceeded his authority under applicable statutes. Moreover, in Gilligan v. Morgan, *supra*, the Court cited that portion of Orloff v. Willoughby (345 U.S. 93–94, 73 S.Ct. 534) which contains the language quoted by this court in Arnheiter v. Chafee 413 U.S. at 10, 93 S.Ct. at 2446, 37 L.Ed.2d at 416.