Jere L. DENTON, Plaintiff-Appellant,

v.

SECRETARY OF the AIR FORCE, Defendant-Appellee.

No. 26565.

United States Court of Appeals, Ninth Circuit.

June 8, 1973.

Rehearing Denied July 16, 1973.

Lawrence H. Stotter (argued), of Stern, Stotter & Rosenberg, San Francisco, Cal., for plaintiff-appellant.

John Link, Asst. U. S. Atty. (argued), James L. Browning, Jr., U. S. Atty., Steven Kazan, Asst. U. S. Atty., San Francisco, Cal., for defendant-appellee.

Before BROWNING, DUNIWAY and GOODWIN, Circuit Judges.

## OPINION

DUNIWAY, Circuit Judge:

Denton, a former Air Force Captain, appeals from a summary judgment against him. The action was for a declaration that his discharge from the Air Force "under honorable conditions" was illegal, and for the recovery of pay and emoluments of office since the discharge. The court heard the action on the administrative record. We affirm.

### 1. *The Administrative Proceedings.*

Denton was stationed in Germany. In February, 1964, he was informed by his Commanding General that he was recommending action under Air Force Regulation 36–2[1] to effectuate Denton's discharge. Four allegations were the basis of the recommendation: (1) wrongfully cohabiting with a woman not his wife, he being then married; (2) having in his possession numerous obscene photographs; (3) failing to provide, without good cause, timely and adequate financial support to his legal dependents; and (4) continuing to associate with a person known by him to be a confessed and convicted agent of a communist government. On March 16, Denton responded, denying that the matters charged were of such importance that he should be separated from the service. On May 6, a Selection Board found that on the basis of the record before it Denton should show cause why he should be retained in the Air Force. On May 21, Denton was informed of this action by letter accompanied by a "Statement of Reasons" which set out the same four allegations, together with another, (5) that on or about December 2, 1963, he had exhibited a defective attitude and behaved himself with disrespect toward his commanding officer, Lt. Colonel Wyse. This was based on an unsworn statement of Wyse.

At Denton's request, a Board of Inquiry [the Board] was ordered convened. On July 1, Denton was notified that the Board would meet on July 16, and that he could request the presence of any witness whose testimony he believed to be pertinent. On July 10, Denton asked for a postponement, and that Wyse appear as a witness before the Board. A postponement until July 30 was granted. Wyse had earlier (July 4) been rotated back to the United States. Inquiry by the Board of Wyse's superiors in the United States resulted in advice that Wyse would not be available to return to Germany to appear as witness. On July 23, Denton requested a further delay until Wyse would be available, or permission to travel to the United States to take Wyse's oral deposition. Both requests were denied, but the convening date of the Board was postponed until August 12.

The Board met on August 12. After a hearing, it recommended that Denton be separated from the Air Force, and be given a general discharge (under honorable conditions).[2] The Board based its recommendations on five findings:

1. The Board finds that Captain Jere L. Denton, AO2227733, did con-

---

[1]. AFR 36–2 establishes, *inter alia*, criteria for identifying officers of the Air Force serving in active military service who, because of evidence of unfitness or unacceptable conduct, should be required to show cause for retention in the Air Force.

[2]. It has been held that, because the vast majority of military discharges are honorable, anything less than an honorable discharge stigmatizes the recipient and is punitive in nature. Bland v. Connally, 1961, 110 U.S.App.D.C. 375, 293 F.2d 852.

duct himself in a manner incompatible with exemplary standards of personal conduct, character and integrity, as is evidenced by his recurrent misconduct in that:

a. He did not during the period 1 October 1963 to 31 December 1963 maintain a close continuing association with an individual known to him to have been convicted of the crime of conspiracy to commit treason against the Federal Republic of Germany, as set forth in paragraph 1a of the Statement of Reasons, but did during the period 29 October 1962 to about 1 December 1963, maintain a close and continuing association with one Herbert Schumacher, an individual known to him to be a confessed agent of the MFS, an East German Intelligence Agency; such association casting a highly unfavorable reflection upon the United States Air Force, as well as constituting a violation of a lawful regulation.

b. He did wrongfully and unlawfully cohabit and engage in adulterous intercourse with Ann Mattson, a woman not his wife, he being at that time married to another woman, such wrongful cohabitation being open and notorious, as set forth in paragraph 1b of the Statement of Reasons, but during the period 4 September 1962 to about 28 January 1963, rather than the dates specified in the Statement of Reasons.

c. He did on or about 2 December 1963, exhibit a defective attitude and behave himself with disrespect toward his Commander, Lt. Col. James M. Wyse as set forth in paragraph 1c of the Statement of Reasons.

d. He did on or about 29 October 1962, have in his possession in his BOQ room in Rothwesten, Germany, a number of obscene photographs as set forth in paragraph 1d of the Statement of Reasons.

2. The Board finds that Captain Jere L. Denton, AO2227733, did mismanage his personal affairs as set forth in paragraph 2 of the Statement of Reasons [failing to provide, without good cause, timely and adequate financial support to his dependents].

This recommendation was affirmed by an Air Force Board of Review on November 5, and on December 3, by the Judge Advocate General, USAF. On December 22, 1964, the Secretary of the Air Force ordered Denton discharged, effective January 26, 1965. On March 22, 1968, Denton applied, under 10 U.S.C. § 1552, to the Air Force Board for the Correction of Military Records for relief from the discharge on grounds of error and injustice. On May 23, 1968, that Board denied his application. This action was filed March 14, 1969.

## 2. *Jurisdiction.*

■ Although the Secretary does not urge that the district court or this court lacks jurisdiction, we consider the question because of our decision in Arnheiter v. Chafee, 9 Cir., 1970, 435 F.2d 691, aff'g Arnheiter v. Ignatius, N.D.Cal. 1968, 292 F.Supp. 911. There we held that the courts do not have jurisdiction to review a decision of the Navy to relieve an officer from command of a ship. We relied upon the famous dictum in Orloff v. Willoughby, 1953, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842, that "judges are not given the task of running the Army." (345 U.S. at 93, 73 S.Ct. at 540). However, we conclude that *Arnheiter* is not applicable here. It related to a matter strictly internal to the Armed Forces—a duty order. So did *Orloff*. The present case differs; it deals with a discharge, an action that deprives the affected officer of his livelihood and, when not "honorable," can seriously hamper his civilian career. In at least one discharge case, the Supreme Court has exercised jurisdiction and invalidated a discharge on the ground that the Secretary had exceeded his statutory powers. Harmon v. Brucker, 1958, 355

U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503. *See also* Marshall v. Brucker, 1958, 356 U.S. 24, 78 S.Ct. 562, 2 L.Ed.2d 503. The Court has not, so far as we can discover, spoken directly to this question since.

The question presented here differs from that in *Harmon, supra.* Denton does not assert the kind of misinterpretation of statutory authority that existed in *Harmon.* His claim is, essentially, that the Air Force Regulations (AFR) guarantee him a fair hearing,[3] and that he did not get one, for a number of reasons. He relies on the general rule, stated and applied in such cases as Vitarelli v. Seaton, 1959, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; Service v. Dulles, 1957, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 and Powell v. Zuckert, D.C.Cir., 1966, 125 U.S.App.D.C. 55, 366 F.2d 634, that administrative decisions are subject to review, and can be judicially held invalid, on the ground that the Secretary has failed to follow his own valid regulations. We hold that we have jurisdiction. A number of other circuits have come to the same conclusion: Mindes v. Seamans, 5 Cir., 1971, 453 F.2d 197; Feliciano v. Laird, 2 Cir., 1970, 426 F.2d 424; Van Bourg v. Nitze, 1967, 128 U.S.App.D.C. 301, 388 F.2d 557; Dunmar v. Ailes, 1965, 121 U.S.App.D.C. 45, 348 F.2d 51. *See also* Schwartz v. Covington, 9 Cir., 1965, 341 F.2d 537, 538, n. 1; Craycroft v. Ferrall, 9 Cir., 1969, 408 F.2d 587.

### 3. *The Scope of Review.*

The federal courts do not sit to run the Air Force, or, except possibly in an extreme case, to tell it on what grounds it may or may not discharge an Air Force officer. The Air Force is entitled to discharge an officer on grounds rationally related to the standards of fitness for retention in that branch of the service.

The question before us is, did Denton get the fair hearing that the Air Force regulations require? We consider Denton's arguments seriatim.

### 4. *Finding 1a—association with Schumacher.*

The facts are not in dispute. Denton met Schumacher in 1961 and became a good friend of Schumacher and his family. In April of 1962, Schumacher and one Straube made contact in East Germany with two persons acting on behalf of the MFS, an East German intelligence organization. They received about $200 each, for which they were to obtain information relating to the activities of the CIC (Counter-Intelligence Corps) and its employees in Kassel, Germany. Neither Straube nor Schumacher followed through on these plans. In July of 1962 they voluntarily disclosed their activities to German and United States authorities, and they were eventually convicted of "treasonable relations." ("Treasonable relations" is a minor crime, as opposed to "treason" which is a major crime.) Schumacher was sentenced to six months in prison.

On October 29, 1962, Denton was interviewed by a special agent of the Office of Special Investigations [OSI] who was investigating Schumacher's relationships with Americans. He explicitly told Denton of Schumacher's activities. However, Denton decided that Schumacher's activities were not quite as serious as the agent had indicated, and he continued his close association with Schumacher. During 1963 Denton had several meetings with Col. Wyse at which Denton's association with Schu-

---

3. AFR 36–2 was promulgated pursuant to statutory provisions for separation of officers from the regular Air Force, 10 U.S.C. § 8791 et seq., and for separation of reserve officers, 10 U.S.C. §§ 1162–63. Section 8792 (separation of regular Air Force officers) entitles the officer to a "fair and impartial" hearing; there is no similar provision for reserve officers in 10 U.S.C. §§ 1162–63. Because Denton was a reserve officer, this statutory guarantee does not apply to him. However, AFR 36–2 applies to both regular and reserve officers, and thus is applicable to Denton. AFR 36–2 reiterates the guarantee of a "fair and impartial" hearing.

macher was discussed. Wyse felt that AFR 205–57[4] was applicable. Denton disagreed, feeling that he was violating no Air Force regulation, and continued to associate with Schumacher. Then, on December 2, 1963, Denton again met with Wyse and the subject of his association with Schumacher again arose. This meeting was described in Wyse's statement of December 3, 1963. In what we consider the important respects, Denton's version of the meeting does not differ from Wyse's. What is undeniably clear is that at this meeting Denton was told unequivocally by Wyse that his longtime friendship with Schumacher, which had continued despite several meetings with Wyse on the subject, was in Wyse's opinion highly suspect, that Denton disagreed and indicated he would continue to see Schumacher, and that Denton did in fact continue to see Schumacher.

Denton argues that finding 1a is not supported by substantial evidence. The argument is without merit.

■ He also argues that action under AFR 36–2 with respect to findings 1a and 1c had first to be approved under the provisions of AFR 35–62. Under ¶4(f) of AFR 36–2 proceedings based upon qualifications regarding national security must have first been approved under AFR 35–62. Thereafter, if warranted, proceedings under AFR 36–2 are held. Denton argues that findings 1a and 1c relate to questions of national security, and the Board should not have made findings regarding those allegations until further proceedings had been approved under AFR 35–62. We do not think that finding 1c is related to national security, and therefore we treat Denton's argument only with respect to finding 1a.

Paragraph 3(f) of AFR 35–62 provides that that regulation will not be used where security is not the primary consideration. Here, action under AFR 36–2 was taken on the basis of five allegations. Only one dealt with security qualifications. Therefore, under the language of ¶3(f) of AFR 35–62, the Air Force could reasonably conclude that it need not proceed under that regulation.

■ Denton next argues that under paragraph 10 of AFR 36–2 the Board was required to follow the provisions of AFR 124–4, which it did not do. AFR 124–4 deals with the handling of OSI reports. More specifically, ¶9(d) of that regulation provides that OSI reports are not to be introduced in evidence in proceedings such as the one here, and prohibits furnishing OSI reports to Article 32 investigating officers. Denton does not argue that an OSI report itself was in evidence before the Board. However, an Article 32 Investigating Officer's report (concerning Article 32 charges brought against Denton for unlawful cohabitation) was in evidence before the Board. The Investigating Officer had evidently at one point been shown part or all of the OSI report concerning Denton's relationship with Schumacher. Assuming that this was so, it may have been a security violation under AFR 124–4. However, we cannot see how this circumstance is relevant to the use as evidence of the Article 32 Investigating Officer's report. We see no merit in this argument.

■ Denton argues that the Board improperly considered the statements of Captains Wolff and Hummel. These statements were both part of the Article 32 Investigating Officer's report which were before the Board. One of them relates to finding 1b, and we consider it *infra*. The other, that of Captain Hum-

---

4. AFR 205–57 requires that each Air Force member must notify his commander immediately upon becoming aware of contacts, whether intentional or by chance, of an Air Force member (including himself) or his dependent with individuals or representatives or employees of organizations of foreign governments whose activities or interests are hostile to, against the best interests of, or may be harmful to the United States.

mel, outlined the results of the legal action taken against Schumacher. He stated that Schumacher had been found guilty of "treason," and had been sentenced to ten months in prison. Denton offered no rebuttal before the Board. However, he later submitted to the Board of Review an affidavit of one Henry F. Waldstein, a member of the West German bar. He contradicted the Hummel statement in two respects. He stated that Schumacher had been convicted of "treasonable relations," not "treason," and that Schumacher had been sentenced to six months in prison, not ten months. Denton argues that by virtue of the errors in the Hummel statement, the Board was misled when considering finding 1a, and that its finding was consequently prejudiced. The four-month difference in the length of the sentence we think irrelevant. Hummel's characterization of Schumacher's crime as "treason" as opposed to "treasonable relations" is not significant. The Board found that Denton maintained "a close and continuing association with . . . an individual known by him to be a confessed agent of the MFS. . . ." Schumacher's actual crime, "treasonable relations," supports finding 1a.

Denton argues that finding 1a is fatally vague in that the "lawful regu-

lation" which it is alleged Denton violated was never specified. The argument is frivolous. From the record there is no doubt that Denton was aware that AFR 205–57 was being referred to.

5. *Finding 1b—unlawful cohabitation.*

This finding is not seriously attacked —nor could it be. It is amply supported by the record.

■ In the statement of Captain Wolff, there is a discussion of Denton's alleged relationship with German women and his use of his apartment in that connection. Wolff was of the opinion that no one particular woman lived there, but that Denton kept the apartment to entertain various German women. It is clear that this statement did not prejudice Denton with respect to the only issue it concerned—the alleged wrongful cohabitation with a particular woman. The statement does contain hearsay. However, the Board is not required to follow strict rules of evidence, and because we can see no prejudice here, we find no error.

6. *Finding 1c—disrespect toward Col. Wyse.*

This finding is based entirely upon the unsworn statement of Col. Wyse, the relevant contents of which are set out in the margin.[5] Denton argues that had he

---

5. "On 2 December 1963, at approximately 1130 hours, in my office at Sembach Air Base, Germany, I was approached by Captain Jere L. Denton, AO2227733, and he again renewed his request that I assist him in acquiring the return of some photographs of women in various stages of undress that are presently in the hands of the JAG. I told him that I would look into it. The conversation then revolved around his behavior and apparent lack of judgment in his associations. I informed him that it has been brought to my attention that he had spent a weekend in either late September or early October 1963 in the home of one Mr. Schumacher, a man who had been convicted as an agent of the East German Soviet Intelligence. This weekend referred to was at Kassel, Germany, where Captain Denton had previously undergone investigation on the same allegations. He readily admitted

that he had spent the weekend there and indicated that he still considered Mr. Schumacher a good friend. When I informed him that this was in violation of AFR 205–57 and that the government frowned on behavior such as this, he remarked, 'Well, if the service is going to tell me who I can or cannot associate with, I want no part of the service'. I then told him that I would see if I couldn't oblige him. I also informed him that if my guess was right that he also spent time in the Schumacher home over the Thanksgiving weekend. He readily admitted that he did. Neither of these visits was reported to me by Captain Denton, as required by regulation, and when I hold him that he was violating regulations by associating with known agents of a government unfriendly to the United States, he stated that he 'would like to see them'."

had the opportunity to cross-examine Wyse he would have been able to convince the Board that the alleged disrespect was but a disagreement over the proper interpretation of an Air Force Regulation, that he had at all times maintained a respectful attitude toward Wyse, and that his remarks regarding his no longer wanting any part of the service were taken out of context and given undue emphasis. We cannot escape some skepticism about this argument. Wyse would obviously have been a hostile witness, and all too often cross-examination of such a witness only serves to strengthen the case against the cross-examiner's client. However, occasionally such cross-examination does produce the miracle that lawyers like to attribute to it, and we cannot say with assurance that it would not have done so here.

The only other evidence relating to finding 1c is an unsworn statement by Denton. In it, he does not really deny using the words that Wyse says he used. What he does say is that his statements related to what he believed to be the unfairness of the Air Force's attempt to control the lives of its members, and that he did not intend to indicate that he wanted out of the service. It is for the Air Force, not this court, to say whether the words used were incompatible with Denton's duty toward his superior.

Nevertheless, if finding 1c stood alone, we might well reverse because Denton had no chance to cross examine Wyse. *See* Greene v. McElroy, 1959, 360 U.S. 474, 508, 79 S.Ct. 1400, 3 L.Ed.2d 1377. However, it is but one of five findings, and, for reasons stated *infra*, we hold that the decision must be upheld on the basis of other findings.

### 7. Finding 1d—possession of obscene photographs.

There is no question that Denton possessed the photographs; he took them himself. He argues that they are not obscene, citing recent Supreme Court cases. We certainly do not find them shocking. But we also think that this ground for discharge is a makeweight, and that the Board would have reached the same result without it. See the discussion, *infra*.

### 8. Finding 2—failure to provide for dependents.

The evidence on this question is in conflict, but there was sufficient evidence to support the finding. We do not sit to retry the question, and it makes no difference that, if we had been the Board, we might have found the other way.

### 9. The effect of the doubtful validity of findings 1c and 1d.

For the purpose of this discussion, we assume that findings 1c and 1d cannot stand, 1c because it is based entirely upon unsworn hearsay and Denton had no chance to cross examine his accuser, and 1d because the photographs are not obscene. It does not follow from this that the judgment must be reversed.

When a court finds error in a finding of an administrative body, this does not lead to automatic reversal. Reversal follows if the court has substantial doubt that the same result would have been reached if the questioned finding had not been made. Fairmont Foods Co. v. Hardin, 1971, 143 U.S.App. D.C. 40, 442 F.2d 762, 770–771; Tashof v. FTC, D.C.Cir., 1970, 141 U.S.App.D.C. 274, 437 F.2d 707, 713; NLRB v. Reed & Prince Mfg. Co., 1 Cir., 1953, 205 F. 2d 131, 139; see generally Braniff Airways, Inc. v. CAB, 1967, 126 U.S.App. D.C. 399, 379 F.2d 453.

Here the Board's recommendation was based upon five separate matters, each a ground for the action recommended. At least one of them, finding 1a, appears, even to this non-military body, to be very serious. In addition, the original initiating action did not mention disrespect to Col. Wyse. That ground, like 1d, appears to be a makeweight. Under the circumstances, we have no doubt that the Board would have made the same recommendation if it had found the other way in findings 1c and 1d.

10. *Double jeopardy.*

Denton's final argument is that, in charging him with unlawful cohabitation, the Air Force subjected him to double jeopardy. The basis of the argument is that he had earlier accepted non-judicial punishment under Article 15, UCMJ (10 U.S.C. § 815) for wrongful cohabitation, and was therefore subjected, in violation of the Federal Constitution, to double jeopardy when his general discharge was based in part on this same cohabitation. The Board of Inquiry proceedings, however, were administrative in nature, conducted to determine the fitness of an officer for retention in the Air Force. Paragraph 3b of AFR 36–2 provides that, "[R]ecurrent misconduct is a basis for initiation of action under this regulation when the officer has by the pattern of his actions raised serious doubt regarding his fitness for retention, regardless of whether such misconduct has or has not resulted in prior judicial or nonjudicial punishment." In following this provision of the regulation, the Air Force was not subjecting Denton to double jeopardy as prohibited by Federal Constitution.

Second, Denton argues that under Article 15, UCMJ, punishment for an act or omission which is not a serious crime is a bar to further prosecution. The statute provides that punishment imposed is not a bar to a subsequent court martial for a serious crime or offense growing out of the same act or omission. Appellant argues that by implication the punishment is a bar to further prosecution for an offense which is not serious. This argument is misplaced. We are not dealing here with a subsequent court martial, and the statute is inapplicable. Denton was separated from the Air Force for "recurrent misconduct" which consisted of several elements, and it was proper for the Board to consider the unlawful cohabitation, for which Denton had admittedly been punished, as evidence of such misconduct.

Affirmed.