Wallace B. SHAW, Plaintiff,

v.

Harold GWATNEY and John O. Marsh, Jr., Defendants.

No. LR–C–82–416.

United States District Court, E.D. Arkansas, W.D.

March 30, 1984.

James L. Sloan, Little Rock, Ark., for plaintiff.

A. Doug Chaves, Asst. U.S. Atty., Little Rock, Ark., for U.S. Army.

Curtis L. Nebben, Deputy Atty. Gen., Little Rock, Ark., for State of Ariz.

**1.** Section 708(a) states in pertinent part: "The governor of each state ... shall appoint, designate or detail, subject to the approval of the Secretary of the Army ... a qualified commissioned officer of the National Guard ... to be the property and fiscal officer of that jurisdiction."

**2.** A USPFO is an active-duty Army officer charged with accounting for and overseeing the use of federal property and funds provided by the federal government for use by state National Guard units. The applicable regulations set

## MEMORANDUM OPINION

EISELE, Chief Judge.

The critical issue presented in this lawsuit is whether the defendants deprived the plaintiff of rights guaranteed under the Constitution and various military regulations in the course of relieving the plaintiff from his position as United States Property and Fiscal Officer (USPFO) for the State of Arkansas. The defendants have filed motions to dismiss or, in the alternative, for summary judgment, contending first that the plaintiff was properly relieved and second that the Court should refrain from considering plaintiff's claim because of its military underpinnings. Since the Court rejects both of these contentions, the defendants' motions will be denied.

## I. FACTS

### A. *Background*

The plaintiff, Colonel Wallace B. Shaw, is a commissioned officer in the Arkansas Army National Guard. Since his appointment in the National Guard in 1957, he has held a variety of assignments. Colonel Shaw had never served on extended active duty in the United States Army, however, until 1980 when, pursuant to 32 U.S.C. § 708(a),[1] Governor Bill Clinton nominated him to serve as USPFO [2] for Arkansas. *See* def. exh. B. On May 4, 1980, Lt. General LaVern E. Weber, Chief of the National Guard Bureau (CNGB) of the Department of the Army, approved the nomination of the plaintiff in accordance with section 708 and certain military regulations.[3] *See* def. exh. B. The plaintiff was then ordered to active duty to commence

forth the numerous duties to be carried out by the USPFO. *See* NGR 130–6/ANGR 1102 ¶¶ 3–1, 3–2 (1981).

**3.** Those regulations, NGR 130–6, provide in ¶ 2–4: "In the case of a formal nomination of an ARNG officer by the Governor, the CNGB, if the officer is determined to be qualified, acting on behalf of the Secretary of the Army, will ... order the appointee to AD [active duty] for assignment to the National Guard Bureau for duty as USPFO for the nominating state.

serving as USPFO under the supervision of CNGB Lt. General Weber.

Col. Shaw's tenure as USPFO became imperiled, and then ultimately terminated, over a three-month span in the Spring of 1982. It is the manner in which Col. Shaw's termination was carried out that forms the basis of this suit.

It is undisputed that Major General Harold L. Gwatney, Adjutant General in Arkansas (and co-defendant in this case), wrote Lt. General Weber on March 19, 1982, attributing certain management deficiencies to Col. Shaw. The letter also suggested that Col. Shaw had committed a serious indiscretion in connection with his sale of an automobile to a dealer in Memphis, Tennessee.[4] The letter concluded:

> Because of his lack of management at the USPFO level and the incident described above, I respectfully request that Colonel Shaw's tenure as USPFO for Arkansas be terminated as soon as practical. I am inclosing [sic] a resume on Colonel William R. Clark for your consideration and approval so that the Governor of Arkansas may be able to submit a formal nomination should you find Colonel Clark to be an acceptable substitute for Colonel Shaw.

On March 29, 1982, then-Governor Frank White wrote the CNGB to tender his "Nomination of Officer for Position of United States Property and Fiscal Officer". Although that letter made no direct reference to the plaintiff, it stated in pertinent part: "I am pleased to nominate the following officer to replace the present USPFO for the State of Arkansas: Clark, William R." The Assistant Secretary of the Army for Manpower and Reserve Affairs on May 12, 1982, approved the nomination of Col.

Clark to succeed Col. Shaw. Then on June 8, 1982, Lt. Col. Douglas Randles, Chief of the Personnel Management Branch for the Department of the Army, wrote Col. Shaw, stating:

> 1. You were ordered to active duty on 1 July 1980 under the provisions of Title 10, United States Code, Subsection 708(a). On 29 March 1982, the Governor of Arkansas directed that you be released from active duty by nominating your replacement as the US Property and Fiscal Officer for the State of Arkansas. Your replacement has been approved by the Secretary of the Army. Accordingly, you will be involuntarily released from active duty on 11 June 1982.
> 2. Title 32, U.S.C. 708(a) and this letter will be cited as authority for release. Request that two copies of release orders be forwarded to this headquarters, ATTN: DAPC–OPP–MS.

Three days later Lt. General Weber directly notified Col. Shaw that he had approved Col. Clark as USPFO for Arkansas, effective June 12, 1982, and confirmed that Col. Shaw was relieved as USPFO as of June 11, 1982. Col. Shaw was then reassigned to Fort Sam Houston for "separation processing," at which time he would be removed from active duty.[5] He then apparently was reassigned to the control of the Arkansas Army National Guard. At no time was Col. Shaw given a hearing regarding his termination as USPFO and his resulting discharge from active duty.

### B. *Litigation*

#### 1. *Preliminary Injunction Hearing*

On June 8, 1982, the plaintiff filed a complaint and requested that the Court

---

**4.** The allegations made against Col. Shaw were that he sold the dealer a vehicle whose odometer had been turned back. The allegations also suggested that Col. Shaw had represented the vehicle to be a 1979 model, when in fact it was a 1977 model. Col. Shaw apparently made restitution to the dealer after the dealer complained to Major General Gwatney.

**5.** Under section 708(c), when the USPFO "ceases to hold that assignment, a property and fiscal

officer resumes his status as an officer of the National Guard." The regulations state in pertinent part: "Upon request of the CNGB, the Commander, Military Personnel Center (MIL-PERCEN), ATTN: DAPC–OPR–PS, will issue necessary orders effecting the relief of the USPFO from AD.... The officer called to AD to serve as the USPFO will be released from AD." NGR 130–6/ANGR 11–02, ¶ 1–7o(2)(a) (1981).

temporarily and permanently enjoin General Harold Gwatney and John Marsh, Secretary of the Army, from "taking any further action aimed at effecting Shaw's removal as USPFO for Arkansas." A formal motion for a temporary restraining order was subsequently filed on June 11, 1982.

The Court held a hearing on plaintiff's motion on June 15, 1982, i.e., several days following his removal. The Court found that "if the plaintiff ultimately prevails, the Court has the power to reinstate and to set aside [the defendants'] actions if they are not in accordance with the law." See Tr. 28. On that basis, the Court concluded that Col. Shaw's legal remedy was adequate and therefore denied his motion.

The Court then directed the parties to brief the issue of plaintiff's entitlement to pre-termination procedures. After filing his brief, Col. Shaw filed an amended and substituted complaint adding as defendants (former) Governor Frank White and Col. Clark. The new complaint requested reinstatement "with full pay, allowances, and all other benefits appurtenant to the office of USPFO."

### 2. Plaintiff's Allegations

The crux of the plaintiff's claim is that his removal violated his rights to procedural due process as protected by the fifth and fourteenth amendments to the United States Constitution. Specifically, the plaintiff maintains that he was discharged from the USPFO position, and consequently from active duty, without being given "notice of the charges or an opportunity to defend in violation of [his] rights under the ... Due Process Clauses, in particular his right to liberty (comprehending the right to enjoyment of his good name, reputation, honor, and integrity), and/or in violation of his rights under National Guard Regulation ("NGR") 130–6 and Army Regulation ("AR") 635–100." Second Amended & Substituted Complaint ¶ 11. He contends that applicable regulations explicitly require that before a USPFO is involuntarily relieved for inefficiency and misconduct he must be given notice of the charges and an

opportunity to defend. Col. Shaw states that his alleged inefficiency and misconduct were the basis for his involuntary relief. He concludes that his removal was improper because he was not accorded the procedural rights established under the regulations.

### 3. Defendants' Arguments

Defendants have filed motions to dismiss or, in the alternative, for summary judgment. They raise two principal arguments in support of their motions. First, they contend that Col. Shaw was not entitled to the procedural rights provided under the regulations. They admit, at least implicitly, that if terminated for inefficiency or misconduct at the instigation of the CNGB, Col. Shaw would have been entitled to the procedures and hearing required by the regulations. They also concede that plaintiff was not accorded such procedures before he was removed from the USPFO position. Nevertheless, the defendants assert that the procedural rights created by the regulation are totally irrelevant in the case at bar. According to the defendants there are *two* ways, not merely one, for a USPFO to be relieved from his position: (1) by act of the Secretary of the Army (or in his stead, the Chief of the National Guard), or (2) alternatively, by the acts of the Governor of the state in which the USPFO serves. As noted above, they admit that procedural rights attach in the former instance. In the latter instance, however, the defendants contend that the military regulations simply do not apply. They assert that since the power to appoint is vested in the Governor, and that since the power to appoint necessarily carries with it the concomitant power to remove, a Governor has the inherent right to terminate a USPFO without giving the USPFO the benefit of any of the procedural rights created in the regulations. According to defendants, Col. Shaw was removed not under the Secretary's removal power, but rather through the Governor's removal power. Defendants conclude, that the plaintiff

therefore can claim no entitlement to any pretermination procedural rights.

The second principal argument relied upon by the defendants is that the plaintiff's claim is not justiciable or reviewable by this Court. They contend that the decision to terminate Col. Shaw was a political decision, and as such falls outside the scope of this Court's jurisdiction. Alternatively, they state that even if justiciable, the plaintiff's claim is not reviewable because it is a military decision. They assert quite simply that Col. Shaw's termination lies in the arena of military personnel decision-making into which the judiciary should not enter.

## II. JURISDICTIONAL ISSUES

### A. *Political Question*

■ The court will address the defendants' second argument before proceeding to the first. As to defendants' "justiciability" claim, the Court is not convinced that the issue presented by Col. Shaw represents a "political question" that falls outside the proper boundaries of the Court's jurisdiction. To the extent that defendants rest their argument on the political nature of a Governor's involvement in the appointment of USPFOs, the contention is totally meritless. As observed in *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962), "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and *not the federal judiciary's relationship to the States,* which gives rise to the 'political question.'" (emphasis added). *See also Elrod v. Burns,* 427 U.S. 347, 351–52, 96 S.Ct. 2673, 2678–79, 49 L.Ed.2d 547 (1976). Moreover, insofar as their argument is based on the Executive Branch's exercise of the appointment power, the defendants must also lose. It should be recalled that the Court has not been asked to inquire into the *wisdom* of the decision to replace Col. Shaw with Col. Clark, *see* note 8, *infra;* rather, the Court has been asked to determine whether Col. Shaw was improperly deprived of certain pre-termination rights. These issues are clearly not fore-closed under the "political question" prong of the justiciability analysis.

### B. *Non-Reviewability*

■ The defendants' claim that the issue is not "reviewable" requires a more detailed analysis. In essence, the Court must determine whether the rights allegedly violated by the defendants are sufficiently important to overcome the judiciary's traditional reluctance to review military decisions.

### 1. *Source of the Plaintiff's Rights*

The Court recognizes that there is no constitutional right to serve in the armed forces. *See Nieszner v. Mark,* 684 F.2d 562, 564 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1273, 75 L.Ed.2d 494 (1983). Similarly, no constitutional or statutory provision creates a protectible property right to continued employment for those previously admitted into the armed service. *See Ampleman v. Schlesinger,* 534 F.2d 825, 828 (8th Cir.1976) (citing 10 U.S.C. § 1162 (officer serves "at the pleasure of the President")). Nevertheless, a property right may inure to a military officer based upon other sources, such as rules or regulations promulgated by the military branch under which he serves. *See Perry v. Sindermann,* 408 U.S. 593, 601, 603, 92 S.Ct. 2694, 2699, 2700, 33 L.Ed.2d 570 (1972); *Ampleman,* 534 F.2d at 828 n. 5. In this connection, even if no statutory authority creates an expectancy in continued employment, the regulations of the decision-maker may create a limited due process right to a hearing prior to an adverse employment decision. *Id.; Denton v. Secretary of the Air Force,* 483 F.2d 21, 25 (9th Cir.1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974); *Friedberg v. Resor,* 453 F.2d 935, 938 (2d Cir. 1971). Just as a non-military employer cannot ignore procedural rights created through its own rules, the military, too, must follow its own regulations. *Rucker v. Secretary of the Army,* 702 F.2d 966, 971 (11th Cir.1983); *Colson v. Bradley,* 477 F.2d 639, 641–42 (8th Cir.1973). *See also*

Lunding, *Judicial Review of Military Administrative Discharges,* 83 Yale L.J. 33, 53–56 (1973). Thus, where the military regulations entitle military personnel to pre-termination procedures, and a serviceman is terminated without being given the benefit of those procedures, a colorable due process claim may arise.

### 2. *Limitations on Review of Military Decisions*

■ Nevertheless, review by the federal courts is not automatic. The judiciary has traditionally been reluctant to interfere with the military decision-making processes. Such reluctance stems largely from the legitimate "concern that such review might stultify the military in the performance of its vital mission." *Mindes v. Seaman,* 453 F.2d 197, 199 (5th Cir.1971). As the Supreme Court noted in *Orloff v. Willoughby,* 345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953), "Judges are not given the task of running the Army.  * * *  The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be ... scrupulous not to interfere with legitimate Army matters ...." *See also Chappel v. Wallace,* —— U.S. ——, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983).

■ The policies mandating this reluctance to interfere, do not, however, require the judiciary simply to turn away and refuse to consider any and all military decisions. Obviously, allegations of the denial of important individual rights should be examined carefully. Yet, considering the potential clash between the need to vindicate individual rights and the need to allow unfettered military decision-making, the difficult task for the Court is to determine which types of allegations justify judicial scrutiny. To facilitate this inquiry, the Eighth Circuit has advocated implementation of a two-part test for achieving the proper balance between these competing interests.

First, a plaintiff challenging an internal military decision must allege a violation of the Constitution, a statute, or military regulation, and demonstrate exhaustion of intraservice remedies. If a plaintiff satisfies the first step, the trial court must then balance four factors to determine the claim's suitability for judicial review: (1) the nature and strength of the plaintiff's challenge to the military determination; (2) the potential injury to the plaintiff if review is refused; (3) the type and degree of anticipated interference with the military function; and (4) the extent to which the exercise of military expertise or discretion is involved. *Nieszner,* 684 F.2d 563–64 (citing *Mindes,* 453 F.2d at 201–02).

The Ninth Circuit has also found that if the first test has been met, then it might be possible to streamline the second test.

[W]e suggest that there is a simpler and perhaps sounder manner of handling this issue....

In several decisions, all in the last eight years, this Court has discussed the reviewability of military decisions. In these cases, this Court has specifically held that, while the U.S. judiciary may review armed forces' orders of discharge, *Denton v. Secretary of the Air Force,* 483 F.2d 21, 24 (9th Cir.1973) *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974), federal courts should not review internal military decisions such as duty orders or duty assignments. *Covington v. Anderson,* 487 F.2d 660, 664–65 (9th Cir.1973); *Denton, supra,* at 24; *Arnheiter v. Chafee,* 435 F.2d 691 (9th Cir.1970) (per curiam). *See also Correa v. Clayton,* 563 F.2d 396, 399 (9th Cir.1977).

*Schlanger v. United States,* 586 F.2d 667, 671 (9th Cir.1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979). *But see Gonzalez v. Department of the Army,* 718 F.2d 926, 929–30 (9th Cir.1983) (adopting the four-part test announced in *Mindes* ).

### 3. *Basis of Plaintiff's Claim*

Turning to the first test announced above, the Court must determine whether

the plaintiff has alleged a violation of the Constitution, a statute or military regulations. Defendants assert that neither the Constitution nor any statute gives the plaintiff any expectancy of continued employment as the Arkansas USPFO. It appears that the defendants are correct on this point. The plaintiff, however, claims that certain military regulations establish procedural rights in the context of USPFO terminations. Plaintiff states that the regulations give him the necessary basis on which to assert a property interest.

### a. *Applicable Regulations*

The regulations regarding USPFO personnel actions appear in ¶ 1–7 of NGR 130–6/ANGR 11–02. Subparagraph k states: "Retention. Unless sooner relieved by proper authority for the reasons indicated in o below, individuals appointed as USPFO may be retained until the last day of the month in which he reaches age 60." Plaintiff makes no argument that the language in subparagraph k creates any vested interest in continued employment. Rather, plaintiff points to subparagraph o(1) which sets forth three bases under which a USPFO may be relieved from duty.

o.(1)(a) Age. The CNGB may request retention beyond age 60 for an ANG USPFO, if the individual is qualified for retirement in accordance with Title 10, U.S.C., 676, 1331 and 1332. In accordance with AR 135–32, and 10 U.S.C. 676, ARNG USPFO's may be retained beyond age 60 as an exception to policy approved by the Secretary of the Army only on an individual basis. Requests for retention of an ARNG USPFO beyond age 60 will be forwarded to NGB–ZAP NLT 90 days before the date the individual reaches age 60.

(b) Physical Disability. When disability is of such a nature as to preclude further active duty.

(c) NGB action. The CNGB may recommend to the Secretary of the Army or Air Force that a USPFO be relieved of assignment, if the provisions of AR 635–100 or AFR 36–2/36–3, as appropriate, apply.

It is plain to see that the scheme set forth in subparagraphs k and o establish three bases on which a USPFO may be relieved from his position: he may be relieved upon reaching age 60 (although this may be circumvented if the terms of subparagraph o(1)(a) are fulfilled); he may be relieved for sustaining a physical disability; and, finally, he may be relieved due to actions undertaken by the NGB.

Only the third means of removal directly relates to the case at bar: *If* AR 635–100 (or AFR 36–2/36–3) applies, then the USPFO may be relieved. Paragraph 3–58 of AR 635–100 outlines the conditions and procedures applicable to involuntary relief from active duty. It states in pertinent part:

General. Officers will be involuntarily relieved from active duty upon the recommendation of the Department of the Army Active Duty Board (DAADB) for misconduct, moral or professional dereliction or when their degree of efficiency and manner of performance or the needs of the service require such action. The CG, MILPERCEN will operate the Department of the Army Active Duty Board. * * *

a. Whenever substantial evidence reveals that an officer has committed a significant act of misconduct, moral or professional dereliction, *or the degree of efficiency and manner of performance by an officer require relief from active duty or elimination from the service*, the records of such officer together with all available evidence will be obtained and provided by the CG, MILPERCEN, without recommendation to the Department of the Army Active Duty Board, or other designated board, for consideration within the prescribed guidance and criteria. * * * Cases of officers designated by the Board for release and elimination will be considered for processing under AR 135–175, or NGR 635–101, following their release from active duty.

\* \* \* \* \* \*

b.1. Each officer considered under a and b above *will be notified in writing*

that his/her records and any other available evidence are being transmitted to the DAADB for consideration and will be informed of the criteria under which his/her records were submitted. The Letter of Notification will outline the criteria furnished the Board for guidance in selecting officers for separation. Each officer *will have the right to submit appropriate written material for the Department of the Army Active Duty Board's consideration* regarding his/her case, and the officer concerned or a designee *will be afforded the opportunity to review all of the officer's personnel records and any other written material which will be submitted to the DAADB for evaluation.*

c. The decisions of these boards are final.

d. Officers designated for release under this section may be relieved from active duty on any date between the date of notification and the 90th day after receipt of notification providing the release date is mutually agreed upon by the individual and the commander specified in paragraph 3–60. The release date will not be later than the 90th day after receipt of notification by the officer concerned. The officer will not be released prior to the 90th day without his/her consent. Notwithstanding the foregoing, any officer designated for release by reason of a finding of misconduct, moral or professional dereliction, may be released at any time on or after 5 days following such designation by the board.

\* \* \* \* \* \*

f. Release from active duty under this section is involuntary; therefore, release prior to the 90th day after notification will have no effect on entitlement to readjustment pay. For officers released under the provisions of a and b above, Rule 1, Table 4–4–8, DOD Military Pay and Allowance Entitlements Manual, applies concerning entitlement to and computation of readjustment pay.

\* \* \* \* \* \*

Distilled to its basic terms, the regulation establishes six basic procedural guarantees for officers who are being considered for relief from active duty due to inefficiency, poor performance, misconduct or moral or professional dereliction:

(1) The officer's records and all available evidence against him is to be provided to the Department of the Army Active Duty Board (DAADB) or some other designated board for review.

(2) The officer must be notified in writing that his records and the applicable evidence against him are being transmitted to the DAADB.

(3) The officer or his designee must be given the opportunity to review all his records and the evidence submitted to the DAADB.

(4) The officer must be informed of the criteria under which his records were submitted.

(5) The officer must be informed of the criteria utilized by the DAADB for determining which officers will be relieved.

(6) The officer must be given the right to submit written materials on his own behalf to the DAADB.

If the DAADB decides to terminate the officer, he may agree to be released within ninety days of receiving notification of the DAADB's decision. If he does not consent, he may not be relieved prior to the ninetieth day following notification.[6]

b. Application of the first *Nieszner* test:

Since the plaintiff has alleged that the defendants failed to comply with the regulations and accord him the procedural rights created therein, it appears that plaintiff has appropriately *alleged* a violation of rights safeguarded by the Constitution and regulations. It also appears that there are no administrative remedies remaining to be

---

**6.** The regulations provide a special exception to this rule where the officer has been terminated for misconduct or moral or professional dereliction. In such instances, he may be relieved at any time on or after five days following the DAADB's decision.

exhausted by the plaintiff: he has asked for, but been denied a hearing on his removal as USPFO. No other means of administrative review appear to exist. The Court must therefore conclude that the plaintiff has adequately met the first test necessary under *Nieszner* for invoking judicial review. *See* 684 F.2d at 564 n. 2.

### c. Application of the second *Nieszner* test:

Turning to the second test, if the Court were to adopt the streamlined analysis advocated in *Schlanger,* the Court would have to conclude that the plaintiff has carried his burden of establishing reviewability. It is true that *Schlanger* drew a dichotomy between duty assignments and discharges of military personnel. Apparently, only the latter justify judicial intervention. In a sense, one could categorize Col. Shaw's situation as involving a duty assignment. After all, the action taken was his removal from the assignment as USPFO for Arkansas. But such a simplistic approach is clearly unwarranted in this case. To be sure, Col. Shaw was removed from his "assignment" as USPFO, but the very same decision to remove him from that assignment carried the collateral yet unavoidable effect of removing him from active duty in the United States Army. *See supra* note 5. In essence, by terminating him as USPFO, Col. Shaw lost not only his assignment, but his position as an active-duty officer.

The Court believes that where the collateral effects of a duty assignment decision necessarily include the termination of an officer from active service, the dichotomy announced in *Schlanger* breaks down.

Normal changes in duty assignments are relatively trivial; however, changes in duty assignments that carry extreme adverse consequences, such as discharge from active duty, are not. Certainly, in the latter situation, the judiciary may have to become involved.

Even employment of the four-factor balancing test articulated in *Nieszner* favors judicial review. The Court, as noted *infra,* views the nature and strength of the plaintiff's challenge to the military's actions to be quite significant: he has been deprived of his position as USPFO and active-duty officer without due process.[7] This factor weighs strongly in plaintiff's favor. Likewise, the plaintiff will experience significant injury if review is refused: at present he has been denied the right to a name-clearing hearing as well as the rights to reinstatement, to active duty and back pay. Absent review by this Court, plaintiff has no other remedy. *Cf. Gonzalez v. Department of the Army,* 718 F.2d 926, 930 (9th Cir.1983) (injury insubstantial because plaintiff had already been reinstated). The Court must conclude that these factors outweigh any concerns over the possible interference with the military function or considerations of the extent to which military expertise or discretion is involved in the decision-making process involving Col. Shaw's termination.[8]

The Court therefore determines that this is a proper case to exercise judicial review of the military's actions.

### III. MERITS OF THE CASE

■ Defendants argue that the plaintiff's removal from his position as USPFO

---

7. When removed from his position and from active duty, Col. Shaw apparently lost his right to dental and health treatment, legal assistance, pay and other benefits. *See* NGR 130–6/ANGR 11–02, ¶¶ 1–7.f, j, m.

8. It should be remembered that the Court has *not* been asked to review the *wisdom* of the decision to terminate Col. Shaw. In other words, Col. Shaw is not asking for the Court to evaluate numerous military personnel decisions and interpose its judgment as to whether there were any proper grounds for his removal from

office. Instead, the fundamental issue is whether the Army was required to adhere to certain procedures established under its own regulations. Thus, the rationality of the Army's decision is not being reviewed by this Court, only the officer's entitlement to due process is at issue. Moreover, if Col. Shaw is correct in asserting that the military is *required* to follow the termination regulations, then obviously there is no problem about "interfering" with military discretion. *See Rucker v. Sec'y of the Army,* 702 F.2d 966, 971 (11th Cir.1983).

emanated from the exercise of executive power vested in the Governor of Arkansas. Describing the Governor's authority in connection with filling USPFO positions as the "power to appoint", the defendants assert that the power to appoint necessarily encompasses the power to remove. The defendants conclude that the termination of the plaintiff was effected at the behest of the Governor; consequently Col. Shaw was not entitled to any procedural rights, as contained in military regulations. Because the defendants' argument rests on an invalid premise, their argument must fail. As will be discussed below, the Governor of a state has no power of appointment, at least in the conventional sense. And it further appears that the Governor lacks any unilateral power to remove a USPFO.

As noted in *Keim v. United States*, 177 U.S. 290, 293, 20 S.Ct. 574, 575, 44 L.Ed. 774 (1900), "[i]n the absence of specific provision to the contrary, the power of removal from office is incident to the power of appointment." Defendants assert that Governor White had the power of appointing the USPFO of Arkansas and that by "appointing" Col. Clark, as Col. Shaw's successor, Governor White thereby removed Col. Shaw from his position. Admittedly, the argument has some superficial appeal. Nevertheless for several reasons the Court is persuaded that the Governor of Arkansas has no true power of appointment of a USPFO.

As a preliminary matter, it should be noted that the language of section 708, which discusses the procedure for designating USPFOs, is somewhat misleading. The statute does provide that the Governor of each state "shall appoint, designate or detail" a member of the state's National Guard to be the USPFO for that state. The legislative history reveals, in fact, that Congress intended a state's USPFO to be "satisfactory to the State Governor as well as to the military secretaries." H.R.Rep. No. 1879, 83d Cong.2d Sess. (1954), *reprinted in* 1954 U.S.Code Cong. & Ad. News 2504, 2505 [hereinafter "House Report"].

Nevertheless other language of the statute reveals that the Governor's power to "appoint, designate or detail" does not constitute the "power to appoint" in the conventional sense. Instead, the power held by the Governor is merely the power to nominate, not the power to appoint.

> The governor of each State ... shall appoint, designate or detail, *subject to the approval of the Secretary of the Army and the Secretary of the Air Force*, a qualified commissioned officer of the National Guard of that jurisdiction ... to be the property and fiscal officer of that jurisdiction.

32 U.S.C. § 708(a). (emphasis added). The legislative history reveals that Congress meant for the Governor to make a recommendation to the Secretary, who, in turn, would then determine whether to carry out the recommendation. In the words of the House Armed Services Committee report, the Governor's nomination of a person to serve as USPFO is "subject to veto by the Secretary." House Report, *supra* at 2505.

There is little case law discussing the status of a USPFO and his relationship with the Governor of the state in which he serves. Nevertheless, the one case that seems to have some relevance supports the view that the Governor merely nominates a USPFO and that the final "appointment power" rests with the Secretary. In *Woodford v. United States*, 77 F.2d 861 (8th Cir.1935), the USPFO for Arkansas had been charged with conversion of federal property while performing his duties as USPFO. After being convicted, he appealed on the grounds that the indictment under which he was charged was fatally defective because he was not an "officer of the United States" within the meaning of the applicable criminal statute. In rejecting his argument on appeal, the Eighth Circuit closely examined the nature of the USPFO position and, particularly, the role that a Governor plays in the USPFO's assignment. First, the Court quoted the relevant statute—39 Stat. 200—which bears a

striking similarity to section 708.[9] *See* 77 F.2d at 863–64. Then, the Court observed:

> It will be noted that the act last quoted provides that the Governor of each state shall "appoint, designate or detail" some officer from the National Guard of the state, who, upon approval by the Secretary of War, shall be regarded as "property and disbursing officer of the United States." Upon entering upon the performance of his duties the said officer must give a good and sufficient bond to the United States for the faithful performance of his duties, and "for the safekeeping and proper disposition of the Federal property and funds intrusted to his care." The Secretary of War, thereupon, is authorized to pay to such property and disbursing officer so. much as, in the judgment of the Secretary, is necessary out of the annual appropriation by the government for the support of the National Guard of the state. The property and disbursing officer shall render, through the War Department, such accounts of federal funds "intrusted to him for disbursement" as may be required by the Treasury Department, and shall receive "pay for his services at a rate to be fixed by the Secretary of War."
>
> The indictment describes appellant as "an officer of the United States, to-wit, the Property and Disbursing Officer of the United States for Arkansas, duly appointed and acting as such" under the provisions of this act of Congress. *This argument of counsel is directed mainly to their contention that the appointment is by the Governor of the state, and, therefore, not by the head of a department of the government* as required by constitutional mandate. The meaning conveyed by the language of the act is clear and unambiguous. *The Governors of the states merely designate or detail the* officers of the National Guard *for the consideration of the Secretary of War* as *proposed* property and disbursing officers of the United States, to administer allotments out of the annual appropriation made by the government for the support of the National Guard of the several states. *When the persons* so designated *are approved by the Secretary of War, they become such officers of the United States* within the meaning of section 2 of article 2 of the Constitution. The indictment alleges that the appellant was duly so appointed and so acted. The Secretary of War is the head of a department of government; a cabinet officer. Appointment by him is expressly authorized by act of Congress. Approval of an appointment, designation, or detail, made by the Governor is equivalent to a direct appointment by the Secretary himself.

77 F.2d at 864 (emphasis added). Under the scheme explained in *Woodford,* the predecessor to section 708 merely vested the Governor with nominating power, not with final appointment power. In short, the Governor may designate and propose, but the Secretary must give final approval before the person so designated can serve as USPFO.

The enactment of the current statute, codified in section 708, apparently effected no change in the roles of the Governor and the Secretary in the appointment of the USPFO. Indeed, the dispositive language has remained unchanged: the governor may "appoint, designate or detail, subject to the approval of the Secretary ...."[10] But several other factors also indicate

---

**9.** The statute at issue in *Woodford* read, in pertinent part: "The governor of each State and Territory and the commanding general of the National Guard of the District of Columbia *shall appoint, designate, or detail, subject to the approval of the Secretary of War,* The Adjutant General or an officer of the National Guard of the State, Territory, or District of Columbia, who shall be regarded as property and disbursing officer of the United States." Section 67, Chapter 134, Act June 3, 1916, 39 Stat. 200, as amended (32 U.S.C.A. § 49) (emphasis added).

**10.** The legislative history reveals, in fact, that Congress specifically rejected a proposal to switch the roles of the Governor and Secretary whereby the Secretary of the Army would propose a candidate to the Governor, subject to the joint approval by the Governor of the state and the Secretary of the Air Force. *See* House Report, *supra,* at 2505.

strongly that the Governor exerts only a power of nomination, not appointment. First, it is clear that the Secretary establishes the basic qualifications (beyond those set out in the statute) for any potential nominee the Governor might recommend. *See* NGR 130–6. Such control over qualifications is inconsistent with the view that the Governor exercises total dominion over the appointment process. Second, the Army's own *regulations refer to the Governor's role as "nominating" rather than "appointing" the USPFO.[11] See* NGR 130–6, ¶ 2–4, *quoted in* note 3 *supra.* Third, as observed in *Woodford,* USPFO's are federal officers, not state officers. Indeed, as further discussed *infra,* upon selection, USPFOs become United States active-duty officers. Obviously, a state Governor would have no authority to appoint a truly federal officer. All of these factors convince the Court that Congress has vested the Governor only with the power to nominate; the true power to appoint lies in the Secretaries of the Army and Air Force. The Court must therefore conclude that the power to remove likewise rests with the Secretaries, not with the state Governors.

Even if the Court were to assume that the Governor exercises some nominal degree of control over the appointment of the USPFO, the Court is convinced that such power to appoint would not also include the power to remove. The *Keim* rule, which vests the power to remove in the party that does the appointing, is designed to apply where, once appointed, the appointee falls under the ultimate control and supervision of the appointing entity. Indeed, *Keim* provides a perfect illustration—there an employee of the Department of the Interior

was discharged by the Secretary of the Interior.

Obviously, the situation of a USPFO is markedly different. Even assuming the Governor's power is more than a mere "power of nomination" it is clear that the USPFO acts totally outside the Governor's control. Once appointed to the position of USPFO, the officer no longer is a member of the state's National Guard.[12] In fact, he may not be assigned any state National Guard duties. *See* NGR 130–6 ANGR/11–02 ¶ 1–4b(2). Instead, he is placed on active duty as a United States Army officer. *See* NGR 130–6/ANGR 11–2 ¶ 1–4b(1).

Once ordered to active duty, the USPFO falls "under the direct control of the President." House Report, *supra* at 2506. His salary is paid, not out of the state's National Guard funds, but directly out of the United States Treasury.[13] *See* 10 U.S.C. § 672(d). *See also* NGR 130–6/ANGR 11–02 ¶ 2–1.

It is thus clear that once appointed, the USPFO ceases to be under the control of the state National Guard (and thus, the control of the Governor) and instead falls under the supervision and control of the Secretary of the Army (or Air Force) acting on behalf of the President. The reason for this transition is elementary considering the nature of the USPFO's job. The *raison d'etre* of the USPFO is to ensure accountability. Since the federal government pours millions of dollars worth of equipment and funds to the state National Guard units, it is imperative that a federal official be on hand to ensure that the money and equipment are properly managed and maintained and not lost or misplaced. In short, the USPFO stands as the guardian of the federal fisc. Among other func-

---

11. It is interesting to note that even Governor White apparently views his power as one of nomination, not appointment. Indeed, his March 29, 1982, letter to the Chief of the National Guard Bureau recommending Col. Clark to serve as the new USPFO is termed a "nomination" rather than an "appointment." *See* def. exh. C.

12. Under Ark.Stat.Ann. § 11–104 (1976 Repl.), the Governor of Arkansas is designated Com-

mander-in-Chief of the Arkansas National Guard.

13. *Cf. Taylor v. Jones,* 653 F.2d 1193, 1206–07 (8th Cir.1981) (Adjutant General of Arkansas not a federal officer insofar as he is a state employee, paid with state funds and the federal government has no direct form of control over him).

tions he protects the federal government against potential misuse of federal funds by the state National Guard units. Thus, the USPFO's status as a *federal* officer, as opposed to a *state* officer, derives not only from the language of the statute and the regulations, but also from fundamental management policy.

Thus when carrying out his official duties, the USPFO is not subject to the control of the Governor. Whatever degree of control the Governor exerts over the USPFO's appointment simply has no bearing on the USPFO's retention in office. The USPFO is a *federal* officer subject to federal control and performing a *federal* function. Unless the Secretary agrees to remove the USPFO, there is nothing the Governor can do.[14]

The upshot of this is that there really are not two ways in which a USPFO can be removed from his position. Only the Secretary may remove a USPFO. Since the Governor had no independent authority to remove Col. Shaw from his position as USPFO for Arkansas, the only way Col. Shaw *could* be removed is by the act of the Secretary. Consequently, the defendants' motions to dismiss or, in the alternative for summary judgment, must be denied.

As noted above, the defendants appear to concede that if Col. Shaw were terminated through the Secretary's exercise of authority, the provisions of NGR 130–6 and AR 635–100 would apply. Those regulations create six basic procedural guarantees for officers who are being considered for involuntary removal from their USPFO position, and hence relief from active duty. It is undisputed that Col. Shaw was not accorded these procedural guarantees. Thus, it appears that *he* would be entitled to summary judgment.

The Court believes, however, that considering the military setting in which this case arises, the extent of the remedy claimed by Col. Shaw should be fully briefed by the parties. The Court will consequently withhold fashioning a remedy in order to give the parties an opportunity to attempt to come up with some mutually agreeable solution. If the parties are unable to agree, the defendants shall file a brief with the Court on or before May 4, 1984, showing cause why the plaintiff should not be reinstated to his former position of USPFO or, alternatively restored to active duty, with full back pay, pending the Army's full compliance with the provisions of NGR 130–6 and AR 635–100. The plaintiff will then have up to and including May 18, 1984, in which to file a response to the defendants' submission.

It is therefore Ordered that the defendants' motions to dismiss or, in the alternative, for summary judgment be, and they are hereby dismissed.

---

14. The Court realizes that a Governor may seek to employ political pressures upon the Secretary if the Governor grows dissatisfied with the USP-FO. The critical fact, however, is that the Secretary, not the Governor, must make the final decision whether to retain or remove the USP-FO.